IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NI-Q, LLC**,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>**PROLACTA BIOSCIENCE, INC.**,<br><br>　　　　　Defendant. | Case No. 3:17-cv-934-SI<br><br>**OPINION AND ORDER ON CLAIM CONSTRUCTION** |

Brenna K. Legaard and Angela E. Addae, SCHWABE, WILLIAMSON & WYATT, PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Plaintiff.

Kristin L. Cleveland, KLARKQUIST SPARKMAN, LLP, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; Orion Armon and Alexandra Mayhugh, COOLEY LLP, 380 Interlocken Crescent, Suite 900, Broomfield, CO 80021. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this action brought by Plaintiff Ni-Q, LLC ("Ni-Q") against Defendant Prolacta Bioscience, Inc. ("Prolacta"), Ni-Q seeks a declaratory judgment of non-infringement of U.S. Patent No. 8,628,921 ("the '921 patent"), among other things. The parties originally requested that the Court construe two terms in Claim 1 of the '921 patent: "wherein a match" and

"processing." During the conferral process for claim construction, the parties agreed upon a construction for "wherein a match" and now only disagree over the construction of "processing." On June 1, 2018, the Court held a claim construction hearing. Based on the parties' submissions, the arguments of counsel, and the evidence adduced at the hearing, the Court adopts the parties' construction of "wherein a match" and construes the disputed term "processing" as set forth below.

**STANDARDS**

Patent infringement analysis involves two steps. First, the court construes the asserted patent claims. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Second, the factfinder determines whether the accused product or method infringes the asserted claims as construed. *Id*. The first step, claim construction, is a matter of law. *See Markman*, 517 U.S. at 372; *Vitrionics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Patent claims must precisely define the relevant invention and thereby put both the public and competitors on notice of the claimed invention. *See Phillips*, 415 F.3d at 1312.

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 (quoting *Vitrionics*, 90 F.3d at 1582). There are two exceptions to this general rule: (1) "when a patentee sets out a definition and acts as his own lexicographer;" or (2) "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also Hormone Research Found., Inc. v. Genentech, Inc*., 904 F.2d 1558, 1563

PAGE 2 – OPINION AND ORDER

(Fed. Cir. 1990) ("It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." (citation omitted)).

The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time" of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1313. This is because "inventors are typically persons skilled in the field of the invention," and "patents are addressed to and intended to be read by others of skill in the pertinent art." *Id*. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent," *id*., which includes the "written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

There are some cases in which "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "A determination that a claim term 'needs no construction' or has [its] 'plain and ordinary meaning'" may be sufficient when, for example, a term has only "one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning . . . resolve[s] the parties' dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

In other cases, determining a claim's ordinary and customary meaning requires further examination. This may be because the meaning is not "immediately apparent," terms "have a particular meaning in a field of art," or the patentee has used a term "idiosyncratically." *Phillips*, 415 F.3d at 1314. In those cases, a court construing the claim will consider "those

sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id*. (quoting *Innova*, 381 F.3d at 1116). Such "sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id*. (quoting *Innova*, 381 F.3d at 1116).

The language of "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id*. Additionally, "[t]he context in which a claim term is used in the asserted claim can be highly instructive." *Id.* "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id*. For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Courts should also interpret claim terms in a manner that does not render subsequent claim terms superfluous. *See Stubmo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (noting that the court has "denounced" claim construction that renders phrases "superfluous"); *Merck & Co. v. Teva Pharms. USA, Inc*., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

In addition to the claims themselves, courts should consider the specification in construing claim terms, as the terms "are part of 'a fully integrated written instrument.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). As the Federal Circuit has stated: "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitrionics*, 90 F.3d at 1582). A patent's "specification may reveal a special definition given to a

claim term . . . that differs from the meaning it would otherwise possess," and such definition would govern. *Id*. at 1316. Similarly, a specification may "reveal an intentional disclaimer, or disavowal, of claim scope"—and again, "the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id*. Importantly, though, limitations from the specification should not be imported into the claims, and claims should not necessarily be confined to the "very specific embodiments of the invention" in the specification. *Id*. at 1323; *see also Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) ("While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims."); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). Ultimately, a court must "read the specification in light of its purposes in order to determine 'whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.'" *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300, 1308 (Fed. Cir. 2008) (quoting *Phillips*, 415 F.3d at 1323).

In addition to the text of the claims and specification, courts "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980); *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("[A]n invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office."). The prosecution history of a patent "contains the complete record of all the proceedings . . . , including any express representations made by the applicant regarding the scope of the claims." *Vitrionics*, 90 F.3d at 1582. The prosecution history

may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1289 (Fed. Cir. 2009) (quoting *Phillips*, 415 F.3d at 1317). For example, a patentee may make "a clear and unmistakable disavowal of scope during prosecution," such as "by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (quotation marks omitted). The Federal Circuit, however, also has cautioned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification." *Phillips*, 415 F.3d at 1317. Where there is ambiguity in the prosecution history, it should not limit the claim terms. *See Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002) ("It is inappropriate to limit a broad definition of a claim term based on prosecution history that is itself ambiguous."). Ultimately, the prosecution history "is less useful for claim construction purposes" than the language of the claims and specification. *Phillips*, 415 F.3d at 1317.

Courts may also consider extrinsic evidence in construing a claim, although "while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980). Specifically, dictionaries—and particularly technical dictionaries—may aid in a court's claim

construction. *See id*. at 1318. Expert testimony may also be useful to a court, to the extent that it "provide[s] background on the technology at issue, [explains] how an invention works, [ensures] that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or [establishes] that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id*. Expert testimony, however, consisting of "conclusory, unsupported assertions . . . as to the definition of a claim term are not useful to a court." *Id.* Further, expert testimony "that is clearly at odds with the claim construction mandated by the . . . written record of the patent" should be discounted. *Id*. (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

## CLAIM CONSTRUCTION

Claim 1 of the '921 patent states as follows, with the relevant terms in bold:

> A method for determining whether a donated mammary fluid was obtained from a specific subject, the method comprising:
>
> (a) testing a donated biological sample from the specific subject to obtain at least one reference identity marker profile for at least one marker;
>
> (b) testing a sample of the donated mammary fluid to obtain at least one identity marker profile for the at least one marker in step (a);
>
> (c) comparing the identity marker profiles, **wherein a match** between the identity marker profiles indicates that the mammary fluid was obtained from the specific subject; and
>
> (d) **processing** the donated mammary fluid whose identity marker has been matched with a reference identity marker profile, wherein the processed donated mammary fluid comprises a human protein constituent of 11-20 mg/mL; a human fat constituent of 35-55 mg/mL; and a human carbohydrate constituent of 70-120 mg/mL.

The parties agree that the term "wherein a match" should be construed as "a determination that the marker(s) in the biological sample and donated fluid or milk are the same

and that there are no additional unmatched marker(s)." ECF 75 at 2. The Court finds that this construction comports with the text of the claim and specification and adopts this construction.

   1. **The Parties' Proposed Construction of "Processing"**

The parties dispute the construction of "processing." Ni-Q asserts that "processing" should be given its plain and ordinary meaning, which is broad. Ni-Q argues that in Claim 1, the broad term of "processing" is not limited to any particular type of processing, but that, as the specification discusses, processing as contemplated in the patent can include filtering, heat-treating, separating cream and skim, adding cream, pasteurizing, or other similar steps. Ni-Q asserts that including in Claim 1 any particular type of processing, such as filtering, is not supported by the text of Claim 1 or the specification, which discusses filtering as optional, the same as all of the other types of processing (adding cream, pasteurizing, heat treating, etc.). Ni-Q argues in the alternative that if the Court intends to read a specific type of processing into Claim 1, then the Court should construe processing as requiring filtering and adding cream, as Prolacta previously argued in opposing Ni-Q's motion for judgment on the pleadings. Ni-Q asserts that requiring both of these steps is supported, as Prolacta previously argued, by looking at U.S. Patent No. 8,545,920 ("the '920 patent"), incorporated by reference into the '921 patent as setting out "[m]ethods of obtaining standardized human milk formulations." ('921 patent 11:10-15). Ni-Q notes that all of the processing examples and figures in the '920 patent include *both* filtering and adding cream. Thus, Ni-Q proposes the alternative specific construction of: "requires at least filtering and adding cream to the whole milk if fat, protein, or carbohydrate targets are not met."

Prolacta argues that processing should be construed to require filtering, and to require adding cream only under certain circumstances. Prolacta argues that the claim text always requires some processing step to standardize nutrient values, and "filtering" would be understood

PAGE 8 – OPINION AND ORDER

by a person skilled in the art as the only processing step that could do so as a first step, with adding cream being required only secondarily in some instances. Prolacta further argues that construing processing as requiring adding cream would lead to nonsensical results in Claim 5, which is an embodiment in which cream and skim is separated and then the cream portion is processed. If processing means adding cream, Prolacta argues, then Claim 5 would mean adding cream to cream, which is illogical. Thus, Prolacta proposes the construction of "at least filtering, and adding cream to the mammary fluid if fat, protein, or carbohydrate targets are not met."

### 2. The Court's Analysis

The Court begins with the text of Claim 1. The text of the claim does not indicate any specific processing activity. Claim 1 is a method comprising four steps. The relevant step is the fourth, subpart (d): "processing the donated mammary fluid." The text describing the fourth step does not, however, indicate any particular processing activity, such as filtering, adding cream, pasteurizing, heat-treating, or performing any other type of processing with respect to the donated mammary fluid. Subpart (d) of the claim, however, does include a further requirement that "wherein the processed donated mammary fluid comprises" certain ranges of protein, fat, and carbohydrate levels.

Prolacta argues that the because subpart (d) of Claim 1 includes "processing the donated mammary fluid . . . wherein the processed donated mammary fluid comprises" certain ranges of protein, fat, and carbohydrate levels, a person skilled in the art necessarily would understand that only the activity of filtering would be required in Claim 1 as "processing." The Court disagrees.

The dictionary defines "wherein" as, among other definitions, "in which," "in the course of or during which," or "in regard to which." WEBSTER'S THIRD NEW INT'L DICTIONARY 2602 (unabridged ed. 2002). Thus, Claim 1 requires that at the end of the "processing," the mammary fluid has the requisite range of protein, fat, and carbohydrate levels. The requirement of

PAGE 9 – OPINION AND ORDER

achieving those standardized ranges does not necessarily indicate "filtering" as the required type of processing activity. The Court thus looks to the remaining text of the patent, and also to the '920 patent, which is incorporated by reference as describing the processing methods for obtaining standardized human milk formulations, to see whether there is any further indication of what, if any, specific processing activity is required in Claim 1.

The "Summary" section of the specification of the '921 patent notes that the overall patented method can include subpart (d), processing the donated mammary fluid whose identity markers have been matched. 2:45-47. It further provides "The processing can include: filtering the milk; heat-treating the milk; separating the milk into cream and skim; adding a portion of the cream to the skim; and pasteurizing." 2:50-53. In "Example 1" of the '921 patent, after a woman donates breast milk, the breast milk is tested for the biological markers of the woman's reference sample, and if the references match, the provenance of the milk is confirmed. After the provenance is confirmed, the milk "will be *further* processed, e.g., pasteurized, e.g., into human milk fortifiers, standardized human milk compositions, and/or human lipid compositions. Such compositions will be administered to human infants." 21:31-34 (emphasis added).

Additional claims of the '921 patent also discuss processing. Claim 3 discloses the method of Claim 1, "wherein the processing comprises: (a) filtering the milk; (b) heat-treating the milk; (c) separating the milk into cream and skim; (d) adding a portion of the cream to the skim; and (e) pasteurizing." 22:1-7. Claim 5 provides: "The method of Claim 1, wherein processing comprises separating the milk into a cream portion and a skim portion, processing the cream portion, and pasteurizing the cream portion." 22:12-15. Claim 13 discloses a method for processing donated human breast milk and includes testing a sample to obtain a reference

marker, testing a given sample, comparing the marker of the reference sample and the given sample, and then "processing the donated human breast milk" when the markers match,

> wherein the processing comprises: (i) filtering the donated human breast milk; (ii) heat treating the donated human breast milk; (iii) separating the donated human breast milk into cream and skim; (iv) adding a portion of the cream to the skim to form a human milk composition; and (v) pasteurizing the human milk composition to produce a processed human breast milk composition; and wherein the processed donated human breast milk comprises a human protein constituent of 11-20 mg/mL; a human fat constituent of 35-55 mg/mL; and a human carbohydrate constituent of 70-120 mg/mL.

22:50-62.

Turning to the '920 patent, that patent discusses how a mother's milk or a donor's milk *may* not contain adequate nutrition for a preterm infant. *See* 5:41-45. Thus, the patent discloses methods of making milk fortifiers that can be added to mother's milk and standardized human milk formulations that can be used instead of mother's milk. The patent describes processing for both end results—fortifiers and standardized human milk formulations. For standardized human milk formulations (relevant to the '921 patent and Claim 1), the specification describes processing after the milk is screened (step 1) as including filtering (step 2) and adding cream (step 3). 8:16-32. "At this stage, the composition can be frozen and thawed out for further processing later." 8:33-34. As an option, after step 3 the mineral content can be tested and the composition can be fortified with additional minerals as needed. 8:35-38. The composition is then pasteurized (step 4). 8:39-40.

Some embodiments of the methods to obtain the standardized milk formulations are shown in figure 2 and examples 3 and 4 of the '920 patent. 8:11-13. Figure 2 shows the steps of screening (step 1), filtering (step 2), adding cream (step 3), and pasteurizing (step 4). Example 3 explains that milk was donated, pooled, tested, and filtered. 17:10-17. It then went through ultra-

filtration and was post-washed, with the post wash being added to the concentrated whole milk. Cream was then added, and the product pasteurized. 17:27-41. Example 4 explains that milk was donated, pooled, tested, filtered, ultra-filtered, and post-washed with the post wash added to concentrated whole milk. 18:30-45. Cream was then added and the product could be frozen or tested for minerals with additional minerals added as needed, and the product pasteurized. 18:46-19:8. Thus, the figure and examples of the '920 patent include at least the processing steps of filtering, adding cream, and pasteurizing. There is some indication that in the '920 patent screening was considered to be a "processing" step (step 1). This also finds some support in Example 1 in the '921 patent, which states that after screening the donated mammary fluid is *further* processed.

The specification of the '921 patent provides, however, that processing can include filtering, heat-treating, separating skim and cream, adding cream, and pasteurizing (but not screening). '921 patent 2:50-53. The specification does not limit the scope of the definition of "processing," disavow any of those types of processing activities, or require any of those types of processing activities. The specification also gives as an example of processing, pasteurization by itself. 21:31-32. In the claims, when the inventor wanted specifically to define what type of activity the term "processing" was meant to include, the inventor did so by specifically setting out exactly the processing activity the particular claim included. For example, in Claims 3 and 13 the inventor defined "processing" as including all five of the processing activities listed in the specification, whereas in Claim 5 the inventor defined "processing" as including only separating cream and skim, processing the cream portion, and pasteurizing the cream portion. The fact that Claim 5 defines "processing" as including a sub-step of processing the cream portion is not ideal

drafting, but actually supports a broad construction of "processing" as not requiring any particular type of activity.

Defining "processing" as filtering and adding cream when certain nutritional levels are not met, as proposed by Prolacta, would not make sense in the context of Claims 3, 5, and 13. For example, Claim 3 would read: "The method of claim 1 wherein the filtering and adding cream if fat, protein, or carbohydrate targets are not met comprises: (a) filtering the milk; (b) heat-treating the milk; (c) separating the milk into cream and skim; (d) adding a portion of the cream to the skim; and (e) pasteurizing." Filtering would be listed twice and adding cream is a mandatory step in Claim 3, not a step to be added only if nutritional levels are not met at a certain point. Claim 13 would be similar. Claim 5 would then include filtering, when it currently does not state filtering is part of its processing. Thus, Prolacta's proposed definition of processing would not work if the same definition carries across all claims. The Court must interpret terms in a manner in which they can have consistent meaning across all claims, unless it is clear the terms are meant to have different meanings in different claims. *In re Varma*, 816 F.3d 1352, 1363-64 (Fed. Cir. 2016) ("The principle that the same phrase in different claims of the same patent should have the same meaning is a strong one, overcome only if it is clear that the same phrase has different meanings in different claims.").

Prolacta's proposed interpretation also violates the construction canon noted in *Phillips* that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. The specific steps of filtering and adding cream are included in dependent Claims 3 and 13 definition of the word "processing," and not in independent Claim 1's generic use of the

word "processing." Thus it is presumed that those specific steps are not included in "processing" as that term is used in Claim 1.

Prolacta argues that Claims 3 and 13 merely "order" the method and that Claim 1 still must include filtering, but the text of the specification and the claims do not support this argument. The specification describes five different types of processing steps. Claim 1 requires processing without ascribing any particular step. Claims 3 and 13 describe the method of Claim 1, but where processing includes all five of those steps. The Court does not necessarily disagree that within Claims 3 and 13 those five processing steps need to be performed in the order set forth in the claims, but nothing in the text of the claims or the specification supports the conclusion that if the processing steps specifically set forth in Claims 3 and 13 need to be performed in any particular order, that means that filtering is required in Claim 1. Prolacta offers no authority for that proposition.

Moreover, the '920 patent does not support Prolacta's proposed definition. The '920 patent discusses processing as including at least the steps of filtering, adding cream, and pasteurizing. The figure and examples also include at least those steps. Although those are just some embodiments of the patent, there is nothing in the patent that supports a mandatory step of only filtering.

Prolacta argues that filtering must occur in Claim 1 because the nutritional values of the donated mammary fluid must be altered under Claim 1. The '920 patent describes the problem of how mother's milk and donor's milk often does not have sufficient nutrition for preterm babies. *See* 1:25-37 (noting that donor's milk "in most instances" does not have sufficient nutritional content for preterm babies and that it is "often" desirable to feed preterm babies fortified mother's milk). It describes methods for standardizing nutritional content in donated milk, at

least within an acceptable range. Notably, the '920 patent does not state that donated milk (or mother's milk) *always* has insufficient nutritional values. Nor does the '921 patent discuss processing to alter nutritional content in a mandatory manner. The '921 patent repeatedly states that the donated mammary fluid "*can*" be processed further. *See* 2:27, 29, 43, 45; 10:56, 58 (emphasis added). In Example 1, the only type of processing listed is pasteurization, which does not change the nutritional content. Thus, thus general purpose and the specification do not support the conclusion that processing must always change the nutritional content of the donated mammary fluid.

Most importantly, the text of Claim 1 does not support Prolacta's argument that the nutritional content of the milk must always be altered. After describing the steps for matching the identity markers, subpart (d) merely requires "processing . . . wherein the processed donated mammary fluid comprises" the specific nutritional values. There is no causal link between the processing and the final values such that the processing must *create* those nutritional values. As discussed above, "wherein" can mean "in which" or "during which." If donated mammary fluid already has the requisite nutritional values when it is donated, and it is only pasteurized, then after pasteurization the processed donated mammary fluid would comprise the requisite nutritional levels and would meet the requirements of Claim 1. Thus, although Claim 1 requires processing and requires that the processed milk have the requisite levels of protein, fat, and carbohydrate, it does not necessarily require filtering or altering the nutritional content of the donated mammary fluid. Prolacta's argument that the nutritional content of the donated milk must be altered based on the text of Claim 1 is rejected.

The plain and ordinary meaning of the word "processing" is broad. The dictionary defines "process," among other definitions, as:

> to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result: put through a special process: as **a**(1): to prepare for market, manufacture, or other commercial use by subjecting to some process (-*ing* cattle by slaughtering them) (-*ed* the milk by pasteurizing it) (-*ing* grain by milling) (-*ing* cotton by spinning) (2): to make usable by special treatment (-*ing* rancid butter) (-*ing* waste material) (-*ed* the water to remove impurities))

WEBSTER'S THIRD NEW INT'L DICTIONARY 1808 (unabridged ed. 2002).

Neither Claim 1 nor the specification of the '921 patent disavow a broad definition of "processing." To the contrary, the specification and the claims discuss five different activities that "processing" can include in the context of the '921 patent.[1] These same processing activities are also set forth in the '920 patent. There is no evidence that a person skilled in the art would interpret the term "processing" in Claim 1 to mean one or more specific processing activities from that list, rather than the more broad definition.

The Court interprets the term "processing" in Claim 1 to mean: "One or more of the following: filtering, heat-treating, separating into cream and skim, adding cream to the skim, or pasteurizing."

**IT IS SO ORDERED**.

DATED this 12th day of June, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[1] The '921 patent's specification's definition of "processing" does not include "screening." In addition, when the claims other than Claim 1 define "processing," they do not include "screening." Additionally, "screening" is accomplished through the steps of subparts (a)-(c) of Claim 1. Thus, if screening was a processing activity, it would render subpart (d) superfluous because "processing" would have already occurred through the completion of subparts (a)-(c). Accordingly, the Court does not find that "screening" is a processing activity under the '921 patent, even if it is under the '920 patent (which the Court does not decide).