# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **Ni-Q, LLC,**<br><br>    Plaintiff and Counter-Defendant,<br><br>    v.<br><br>**PROLACTA BIOSCIENCE, INC.,**<br><br>    Defendant and Counter-Plaintiff | Case No. 3:17-cv-000934-SI<br><br>**OPINION AND ORDER** |

Brenna K. Legaard and Angela E. Addae, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Plaintiff.

Kristin L. Cleveland, KLARKQUIST SPARKMAN LLP, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; Orion Armon, COOLEY LLP, 380 Interlocken Crescent, Suite 900, Broomfield, CO 80021; Alexandra Mayhugh, COOLEY LLP, 1333 2nd Street, Suite 400, Santa Monica, CA 90401. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this patent action, the Court previously granted partial summary judgment in favor of Plaintiff Ni-Q, LLC ("Ni-Q"), finding that the asserted claims of the subject patent are invalid and that Plaintiff did not infringe the asserted claims. Ni-Q had sought a declaration of invalidity and noninfringement and Defendant Prolacta Bioscience, Inc. ("Prolacta") had asserted a counterclaim against Ni-Q for infringement, seeking money damages and injunctive relief. Those claims have now been resolved with the Court's Opinion and Order granting Plaintiff's motion

PAGE 1 – OPINION AND ORDER

for summary judgment. The sole claim remaining in this case is Plaintiff's claim for money damages and injunctive relief under Oregon's Unlawful Trade Practices Act ("UTPA"), Oregon Revised Statutes ("ORS") § 646.605, *et seq*. Prolacta moves for summary judgment against this claim. For the reasons discussed below, Prolacta's motion for summary judgment is denied.

## STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

### B. Oregon's UTPA

Ni-Q alleges that Prolacta has violated Oregon's UTPA. Specifically, Ni-Q alleges that Prolacta violated ORS § 646A.810(2) by asserting a patent infringement claim in bad faith. ORS § 646A.810(2) provides:

> A person or the person's affiliate may not communicate a demand, or cause another person to communicate a demand, to a recipient if in the demand the person or the person's affiliate alleges, asserts or claims in bad faith that the recipient has infringed or contributed to infringing a patent or the rights that a patentee has . . . under the patent.

ORS § 646A.810(2).

In addition, ORS § 646A.810(4) provides a list of possible conditions that "[a] court may consider . . . as evidence that a person or the person's affiliate has, in bad faith, alleged, asserted or claimed an infringement of a patent." These include that the person making the demand did not properly compare the claims of the patent to the features of the allegedly infringing product (§ 646A.810(4)(d)) and that the person making the demand knew or should have known that the claim of infringement was without merit or was deceptive (§ 646A.810(4)(f)). Any violation of ORS § 646A.810(2) constitutes an unlawful practice under ORS § 646.608, which triggers the right to file suit.

## BACKGROUND

Prolacta is a corporation that produces and sells human milk formula to medical service providers. Prolacta sells its formula to hospitals for $180 per ounce, and a single premature infant might consume thousands of dollars' worth of formula during the course of his or her hospital stay. Ni-Q is a relatively new entrant into the market for producing and selling human milk formula. Ni-Q is a competitor of Prolacta. Ni-Q's human milk formula is sold at a significantly lower price than is Prolacta's.

On November 11, 2016, Prolacta sent a letter ("November 11 Letter") to the Chief Executive Officer ("CEO") of Ni-Q, Bill Pfost. ECF 25-2 at 1. The letter's stated intent was to apprise Mr. Pfost of the patents owned by Prolacta. Prolacta admitted to having "very limited visibility into the products and processes being developed by [Ni-Q]." *Id*. Nonetheless, Prolacta

expressed a suspicion "that [Ni-Q] may be relying on matching donor genetic identity marker profiles with donated milk samples." *Id*.

In the November 11 Letter, Prolacta alleges that Ni-Q infringed U.S. Patent No. 8,628,921 (the '921 Patent), among other patents. This patent involves "methods and systems for diagnosing or screening human milk samples to confirm that the milk is from a defined source." ECF 57-1 at 5. Prolacta acquired the '921 Patent through an assignment of ownership rights from the inventors. Ni-Q asserts that the '921 Patent has an effective filing date of March 20, 2008, and Prolacta does not dispute this date.[1]

Claim 1 of the '921 Patent describes "[a] method for determining whether a donated mammary fluid was obtained from a specific subject." This method comprises:

> (a) testing a donated biological sample from the specific subject to obtain a least one reference identity marker profile for at least one marker;
>
> (b) testing a sample of the donated mammary fluid to obtain at least one identity marker profile in step (a);
>
> (c) comparing the identity marker profiles, wherein a match between [them] indicates that the mammary fluid was obtained from the specific subject; and
>
> (d) processing the donated mammary fluid . . . wherein the processed donated mammary fluid comprises a human protein constituent of 11-20 mg/mL; a human fat constituent of 35-55 mg/mL; and a human carbohydrate constituent of 70-120 mg/mL.

---

[1] The '921 patent was filed on August 23, 2012. The '921 patent is a continuation of Application No. 13/079,923, which was filed on April 5, 2011. This application is a continuation of Application No. 12/052,253, which was filed on March 20, 2008. Ni-Q asserts that Application No. 12/052,253 is a continuation-in-part of international application PCT/US2006/036827, which was filed on September 20, 2006, in accordance with the Patent Cooperation Treaty. Ni-Q argues that because the international application contains no disclosure of either the macronutrient ranges or the mammary fluid processing treatment mentioned in claim (1)(d) of the '921 patent, the chain of continuation is broken at this point and the '921 Patent therefore has the effective filing date of March 20, 2008.

PAGE 4 – OPINION AND ORDER

'921 Patent at 21:45-65. In the November 11 Letter, Prolacta encouraged Ni-Q to review the '921 Patent, among others, to ensure that Ni-Q was not infringing the patented method of using genetic information from donated milk samples to confirm the identity of the donors.

On March 21, 2017, Mr. Pfost sent an email to Prolacta's CEO Scott Elster, contending that Ni-Q was confident that it was not infringing any of Prolacta's patents. ECF 25-2 at 2. Prolacta responded by stating that it remained concerned about Ni-Q's infringement because of information in the brochure for Ni-Q's product. ECF 25-2 at 3. On May 11, 2017, Prolacta, through its legal counsel, requested samples of each product that Ni-Q made with donated human milk. ECF 25-2 at 7-8. Prolacta also inquired about the fat, protein, and carbohydrate constituents in Ni-Q's human milk products. *Id*.

Ni-Q neither submitted the samples nor answered the questions about protein, fat, and carbohydrate constituents. Instead, Ni-Q replied that Prolacta had already admitted to having "absolutely no basis for alleging infringement." ECF 25-2 at 9-10. According to Ni-Q, this admission was based on Prolacta's statement that it had so far been "unable to uncover details regarding Ni-Q's products sufficient to show whether or not Ni-Q's products are infringing Prolacta's patent[]." *Id*. Ni-Q also requested that Prolacta submit a claim chart, to indicate exactly how Ni-Q's product incorporates all the claim elements from Prolacta's patent. Prolacta did not submit the requested claim chart. *Id*.

On May 31, 2017, Prolacta filed a complaint against Ni-Q in the Central District of California ("California Lawsuit"). The California Lawsuit alleged that Ni-Q was infringing the '921 Patent. In response, Ni-Q filed a Motion to Dismiss and a Rule 11 Motion for Sanctions against Prolacta. *Prolacta Bioscience, Inc. v. Ni-Q, LLC*, 2017 WL 5664985, at *1 (C.D. Cal. 2017.) Judge James Otero decided the case, *id.*, and dismissed Prolacta's infringement complaint

for lack of proper venue under 28 U.S.C. § 1400(b).[2] *Id.* at *7. The court declined to issue Rule 11 sanctions against Prolacta. *Id.*

While the California Lawsuit was pending, Ni-Q filed its lawsuit in this Court, seeking declaratory relief and money damages. Prolacta filed a counterclaim alleging that Ni-Q infringed the '921 Patent. Ni-Q filed a motion for summary judgment, arguing that the asserted claims of the '921 Patent are invalid for patenting natural law and asserting that there is no genuine issue of material fact that Ni-Q infringes the '921 Patent even if it is valid. On September 21, 2018, Ni-Q moved for leave to amend its answer to Prolacta's counterclaim. The proposed amended answer added the affirmative defense of inequitable conduct. Ni-Q asserted that it first became aware of the fact that Prolacta might have engaged in inequitable conduct before the U.S. Patent and Trademark Office ("PTO") when Prolacta filed its response to Ni-Q's motion for summary judgment. Ni-Q's new affirmative defense was based on allegations that Prolacta engaged in sales or offers to sell products covered by the '921 Patent more than one year before the effective filing date of the patent. The Court granted the motion to amend, finding that Ni-Q's proposed pleading met the heightened standard for alleging fraud. The Court concluded:

> The facts alleged by Ni-Q give rise to a reasonable inference that the inventors knew of the withheld information, which allegedly all were Prolacta publications and commercial sales. Prolacta offers no explanation for the withholding of this information. At this stage of the litigation, these allegations support a reasonable inference of an intent to mislead the PTO.

ECF 130 at 8.

---

[2] "Any civil action for patent infringement may be brought in a judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b).

## DISCUSSION

In its motion for partial summary judgment, Prolacta argues: (1) Ni-Q's UTPA claim is barred under the *Noerr-Pennington*[3] doctrine; (2) Ni-Q's claim for state law tort liability is preempted under federal patent law; and (3) the doctrine of issue preclusion prevents Ni-Q from arguing that Prolacta's conduct in enforcing the '921 Patent meets was objectively baseless because the Central District of California necessarily decided this issue against Ni-Q. Each argument is addressed in turn.

### A. *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine is most often seen asserted as a defense against certain claims of antitrust liability. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) ("Under the *Noerr-Pennington* doctrine . . . defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government."). The parties do not discuss whether the law of the Ninth Circuit or the Federal Circuit applies to the asserted application of *Noerr-Pennington* to a state law tort claim.[4] The Court, however, need not resolve that question because the analysis is the same under either circuit's law. Both Circuits apply *Noerr-Pennington* to patent litigation and pre-litigation communications. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-37 (9th Cir. 2006); *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1377 (Fed.

---

[3] The *Noerr-Pennington* doctrine is named after two cases: *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) *and United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[4] Federal Circuit law applies in analyzing whether federal law preempts Ni-Q's state law claim. *See Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004) ("We apply Federal Circuit law not only to the patent issues but also in deciding whether the patent laws preempt a state-law tort claim.").

Cir. 2004). Both Circuits also extend the immunity from antitrust suits to state law tort action. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) ("There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust."); *Globetrotter*, 362 F.3d at 1377 ("Our decision to permit state-law tort liability for only objectively baseless allegations of infringement rests on both federal preemption and the First Amendment. . . . In addition, the same First Amendment policy reasons that justify the extension of *Noerr* immunity to pre-litigation conduct in the context of federal antitrust law apply equally in the context of state-law tort claims. (citation omitted)).

In its Amended Complaint, Ni-Q alleges that Prolacta engaged in unfair practices by making pre-suit demands without having a reasonable basis to believe that Ni-Q was infringing Prolacta's patent, filing the California Lawsuit without having a reasonable basis to conclude that Ni-Q was infringing Prolacta's patent, and filing the California Lawsuit in California without having a reasonable basis to conclude that it was a proper venue. Thus, alleges, Ni-Q, Prolacta's conduct was done in bad faith. In response to Prolacta's motion for summary judgment, however, Ni-Q adds the bad faith assertions included in its amended answer—that Prolacta enforced the '921 Patent knowing it was invalid because Prolacta had engaged in commercial sales and publications more than one year before the effective filing date.

Ni-Q requests under Rule 56(d) of the Federal Rules of Civil Procedure that the Court stay Prolacta's motion and allow additional discovery on these new allegations. Ni-Q bases its most recent allegations of bad faith on evidence submitted by Prolacta in response to Ni-Q's motion for summary judgment. Specifically, Ni-Q cites to a declaration filed by Prolacta in which the declarant testifies that she purchased Prolacta's patented product in 2006, more than

PAGE 8 – OPINION AND ORDER

one year before the effective filing date of the '921 Patent. Because, as discussed below, the Court finds that Ni-Q has sufficiently raised an issue of fact regarding Prolacta's bad faith and thus the objective and subjective baselessness of Prolacta's enforcement of the '921 Patent, the Court declines to stay Prolacta's motion for summary judgment for additional discovery.

Regardless of whether the asserted bad faith was making pre-suit demands and filing the lawsuit without ensuring that Ni-Q's product infringed or with knowledge that Prolacta's patent was invalid, the actions taken by Prolacta are conduct within the *prima facie* scope of *Noerr-Pennington* doctrine. There are, however, two primary exceptions to *Noerr-Pennington* immunity. The first exception is the "sham" exception. Under the sham exception, "activity ostensibly directed toward influencing governmental action does not qualify for *Noerr* immunity if it is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Octane Fitness*, 572 U.S. at 556 (quotation marks and alterations omitted). The second exception is the "*Walker Process* fraud" exception.[5] Under this exception, enforcement of a patent obtained by fraud on the PTO is not entitled to *Noerr-Pennington* immunity. *See Kaiser Found. Health Plan, Inc. v. Abbott Labs, Inc.*, 552 F.3d 1033, 1045 (9th Cir. 2009). Ni-Q argues that both exceptions apply.

**1. Sham Exception**

"[W]hile genuine petitioning is immune from antitrust liability, sham petitioning is not." *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 525-26 (2002). In order "to qualify as a 'sham,' a 'lawsuit must be objectively baseless' and 'must conceal an attempt to interfere directly with the business relationships of a competitor.'" *Octane Fitness*, 572 U.S. at 556 (alterations omitted)

---

[5] The *Walker Process* fraud exception comes from *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

(quoting *Professional Real Estate Inv'rs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (hereinafter "*PRE*")). More specifically, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *PRE*, 508 U.S. at 60. Under the second prong, the subjective prong, "the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Id.* at 60-61 (emphasis and alteration in original) (citation omitted). Moreover, "[t]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in a sham litigation." *Id.* at 62. In the context of a tort allegation of a "wrongful civil proceeding[]," the plaintiff carries the burden of "prov[ing] that the defendant lacked probable cause to institute an unsuccessful civil lawsuit, and that the defendant pressed the action for an improper, malicious purpose." *Id.*

### a. Objective Baselessness

In evaluating objective baselessness, a court must inquire into the reasonableness of a defendant's litigation at the time when the complaint was filed. *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938 (Fed. Cir. 1995). "A bad faith patent enforcement may form the basis for . . . liability." *Boydstun Metal Works, Inc. v. Cottrell, Inc.*, 2017 WL 4803938, at *5 (D. Or. Oct. 24, 2017); *see also Octane Fitness*, 572 U.S. at 556 ("In other words, the plaintiff must have brought baseless claims . . . to thwart competition (*i.e. in bad faith*)." (emphasis added)).

The Court focuses on Ni-Q's most recent argument, that Prolacta enforced its patent in bad faith because it knew its patent was invalid based on the "on sale bar" of the U.S. Patent Act in effect at the relevant time. For patents predating the America Invents Act of 2011 ("AIA"), if

PAGE 10 – OPINION AND ORDER

a claimed invention is either sold or offered for sale in the U.S. more than one year before the effective filing date, then the patent for that invention is not valid. 35 U.S.C. § 102(b) (pre-AIA). This rule is known as the "on sale bar."

"The on sale bar is triggered if two conditions are met by the critical date: (1) the invention was offered for sale, and (2) the invention was ready for patenting." *Boydstun Metal Works, Inc. v. Cottrell, Inc.*, 519 F. Supp. 2d 1119, 1128 (D. Or. 2007) (citing *Pfaff v. Wells Elecs.*, 525 U.S. 55, 67 (1998)). For patents predating the AIA, the relevant critical date is the date of filing. 35 U.S.C. § 102(b) (pre-AIA). "[T]he invention that is the subject matter of the offer for sale must satisfy each claim limitation of the patent." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1329 (Fed. Cir. 2001). The accused infringer has the burden "to establish by 'clear and convincing evidence that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention.'" *Boydstun*, 519 F. Supp. 2d at 1124 (quoting *Elan Corp., PLC v. Andrx Pharm., Inc.*, 366 F.3d 1336, 1340 (Fed. Cir. 2004). Even one single sale or offer to sell may invalidate a patent under the pre-AIA Patent Act. *See Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1209 (Fed. Cir. 2005) ("We need not consider whether the district court was correct as to all of these sales because a single sale or offer for sale suffices to bar patentability."); *Atl. Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 836 (Fed. Cir. 1992) ("A single sale or offer to sell suffices to bar patentability.").

The '921 Patent's effective filing date of March 20, 2008 is before the AIA. Accordingly, the effective filing date serves as the critical date for the on sale bar analysis. Ni-Q's argument that Prolacta enforced the '921 Patent in bad faith hinges on Ni-Q's assertion that Prolacta sold

or offered to sell products that satisfied the claim limitations of the '921 Patent before March 20, 2007. Because Prolacta knew or should have known about those sales, argues Ni-Q, Prolacta knew or should have known it improperly obtained the patent, the patent was invalid, and that it should not be enforcing the patent.

Prolacta submitted the testimony of Martin L. Lee, PhD, in response to Ni-Q's motion for summary judgment. According to Dr. Lee, "[t]he claims of the '921 patent . . . cover Prolacta's NEO20™ product, which is manufactured from DNA matched donor milk, and which includes the multi-nutrient enhanced ranges cited in the patent." ECF 99 at 8: ¶ 18. Neither party argues that NEO20 is not covered by the claims of the '921 patent.

Prolacta also submitted the declaration of Dr. Sarah Lentz-Kapua in response to Ni-Q's motion for summary judgment. Dr. Lentz-Kapua testified that she first learned about Prolacta's NEO20 product "in or around 2006" and that it was being sold at the time. ECF 98 at 1-2. This testimony is evidence that NEO20—a product that fully embodied the claims of the '921 Patent—was being sold more than one year before the effective filing date of March 20, 2008. Indeed, after Ni-Q pointed out this issue to counsel for Prolacta, counsel for Prolacta suggested that the parties file a joint motion to dismiss under Rule 41 of the Federal Rules of Civil Procedure and indicated that otherwise Prolacta "could unilaterally concede the invalidity of the asserted claims and move to dismiss its counterclaims." ECF 118-8. Prolacta later changed its position and averred that its first sale of NEO20 was March 27, 2007, one week after the on sale bar date.

There is conflicting evidence in the record regarding whether Prolacta first sold or offered for sale a product that fully anticipated the claim limitations in the '921 Patent before March 20, 2007. Accordingly, Ni-Q has raised a genuine issue of fact whether the on sale bar

applies and therefore whether Prolacta enforced its patent in bad faith. There is thus an issue of fact whether Prolacta's enforcement was objectively baseless.

### a. Subjective Baselessness

For the same reasons there is an issue of fact on objective baselessness, there is an issue of fact on subjective baselessness. If Prolacta was enforcing a patent that it knew or should have known was invalid, then its lawsuit was to "conceal an attempt to interfere directly with the business relationships of a competitor." *Octane Fitness*, 572 U.S. at 556. Because there are genuine issues of fact regarding whether Prolacta's enforcement was objectively and subjectively baseless, there are issues of fact regarding whether the sham exception applies. Prolacta's defense based on *Noerr-Pennington*, therefore, cannot be resolved by summary judgment.

### 2. *Walker Process* Fraud Exception

In *Walker Process*, the Supreme Court found "that enforcement of a fraudulently obtained patent claim could violate the Sherman Act." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512-13 (1972) ("Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in [*Walker Process*]."). Ni-Q asserts that the '921 Patent was obtained through fraud on the PTO, and thus Prolacta is not entitled to immunity with respect to its infringement action.

In order to make out a *Walker Process* fraud claim, an "antitrust-plaintiff must show . . . that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). Thus, a *Walker Process* plaintiff must allege both materiality and a clear intent to deceive. *Nobelpharma*, 141 F.3d at 1069-70. The materiality standard "requires that the patent would not

have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007). "*Walker Process* intent may be inferred from the facts and circumstances of a case." *Id.* "[O]missions, as well as misrepresentations, may in limited circumstances support a finding of *Walker Process* fraud." *Nobelpharma*, 141 F.3d at 1070. "[T]he knowing failure to disclose sales" can be "particularly egregious" and it "reasonably supports an inference that [the patent applicant] intended to mislead the PTO. . . . because, unlike the applicant's failure to disclose, for example, a material patent reference, the [PTO] has no way of securing the information on [its] own." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1193 (Fed. Cir. 1993).

Ni-Q argues that the *Walker Process* exception applies because Prolacta committed fraud on the PTO by concealing sales and offers to sell of products from before March 20, 2007, which fully anticipated the claimed limitations of the '921 Patent. These included sales and offers to sell NEO20 that occurred in 2006. As explained above, these sales would invalidate the '921 patent under the on sale bar. The concealment of these sales is material because the PTO would not have issued the '921 Patent "but for the patent examiner's justifiable reliance" on Prolacta's alleged misrepresentation and omission. *Dippin' Dots*, 476 F.3d at 1347. Likewise, the clear intent requirement would be met because "evidence of a knowing failure to disclose sales . . . reasonably supports an inference that [the patent applicant] intended to mislead the PTO." *Paragon Podiatry*, 984 F.2d at 1193.

As discussed above, there is a genuine issue regarding the first date of sale or offer for sale by Prolacta of a product covered by the '921 Patent. Accordingly, Ni-Q has raised a genuine issue regarding whether the *Walker Process* exception applies. For this reason as well, Prolacta's

defense based on *Noerr-Pennington* cannot be resolved by summary judgment. Prolacta's motion for summary judgment on this basis is denied.

B. **Patent Preemption**

Under the Supremacy Clause, any state law that conflicts with a federal law is invalid. U.S. Const., Art. VI, cl. 2. Federal Circuit law governs whether federal patent law preempts a state law claim. *Globetrotter*, 362 F.3d at 1374. The Federal Circuit has held that "federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *Globetrotter*, 362 F.3d at 1374. Such state-law claims, including Ni-Q's UTPA claim, can only avoid federal preemption "to the extent that those claims are based on a showing of 'bad faith' action in asserting the infringement." *Id.*

The consideration of "bad faith" for purposes of preemption of this type of tort claim is the same as for purposes of the *Noerr-Pennington* doctrine. *See id.* at 1374-77 (setting forth the "jurisprudential background of the bad faith standard" by discussing *Noerr*, *PRE*, and other cases involving the *Noerr-Pennington* doctrine). The Federal Circuit has held that for purposes of preemption of this type of state-law tort claim, an accused infringer must show that the patent holder engaged in objectively baseless conduct. *Id.* at 1377 ("Accordingly, the objectively baseless standard of *Professional Real Estate* applies to state-law claims based on communications alleging patent infringement, such as those in this case. A plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." (footnote omitted)).

Prolacta argues that ORS § 646A.810 (patent infringement claim made in bad faith) is preempted both by the federal Patent Act and by Congress's constitutional authority "[t]o promote the progress of science and the useful arts, by securing for limited times to . . . inventors

PAGE 15 – OPINION AND ORDER

the exclusive right to their respective writings and discoveries." U.S. Const., Art. I, § 8, cl. 8. Accordingly, Prolacta argues that federal patent law preempts the following subsection from the UTPA:

> [A person] may not communicate a demand . . . to a recipient if in the demand [the person] alleges, asserts or claims in bad faith that the recipient has infringed . . . a patent or the rights that a patentee has, or has granted to an assignee or licensee, under the patent.

ORS § 646A.810(2).

As discussed above, however, Ni-Q has shown a genuine issue of material fact regarding whether Prolacta's enforcement of the '921 Patent, including through pre-litigation letters and the California Lawsuit itself, was objectively baseless. Because the Federal Circuit has held that preemption of state-law torts encompassing this type of claim rests on whether the patent holder's conduct was objectively baseless, there is an issue of fact on whether Ni-Q's UTPA claim is preempted. Accordingly, Prolacta's motion for summary judgment on this basis is denied.

## C. Issue Preclusion

The Federal Circuit applies "the law of the regional circuit to the general procedural question of whether issue preclusion applies" in a patent infringement suit. *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015). Issue preclusion, also known as collateral estoppel, "is designed to 'bar [ ] successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination.'" *Paulo v. Holder*, 669 F.3d 911, 918 (9th Cir. 2011) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)); *see also Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) ("The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding. . . . The issue must have been actually decided after a

full and fair opportunity for litigation." (quotation marks and citations omitted)). Thus, the party asserting issue preclusion must demonstrate: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessarily decided, also described as necessary or essential to the judgment.[6] *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017). Issue preclusion may be used either defensively or offensively. "In both the offensive and defensive use situations the party against whom [collateral] estoppel is asserted has litigated and lost in an earlier action." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329 (1979).

Prolacta asserts issue preclusion defensively against Ni-Q's UTPA claim. Prolacta argues that Judge Otero's refusal to impose sanctions under Rule11 is a final judgment that precludes Ni-Q's argument that Prolacta's California Lawsuit was objectively baseless, as is required for the sham exception to *Noerr-Pennington* and the question of federal preemption.

Whether issue preclusion applies in this case turns on whether Judge Otero's denial of Rule 11 sanctions is "identical" to determining whether Prolacta's enforcement conduct was

---

[6] The Ninth Circuit sometimes discusses issue preclusion as requiring either the issue be "necessarily decided" or "essential to the judgment," interchangeably. *See United States v. Weems*, 49 F.3d 528, 532 (9th Cir. 1995) (setting out the elements as including "necessarily decided" and then discussing the "necessary to the judgment" element as being the same element). The Court uses "necessarily decided" because the weight of Ninth Circuit authority describes the "essential" or "necessary" to the judgment element in this manner for issue preclusion. Additionally, the Ninth Circuit sometimes lists the elements for issue preclusion as: (1) the issue was necessarily decided; (2) the first proceeding ended with a judgment on the merits; and (3) the party against whom preclusion is sought was a party or in privity with a party in the first litigation. *See Paulo*, 669 F.3d at 917. The Court considers the latter two elements to be more appropriate elements for claim preclusion, *see Howard*, 871 F.3d at 1039, although part of having a full and fair opportunity to litigate encompasses being a party or being in privity with a party. *See Taylor*, 553 U.S. at 892-93 (noting that "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit" and then discussing several exceptions to that rule).

objectively baseless and whether that determination was "necessarily decided" when Judge Otero denied Rule 11 sanctions. The Court finds that these elements are not met.

A federal court's authority to impose sanctions under Rule 11 is discretionary, and a court may consider numerous factors. *See* Fed R. Civ. P 11(c)(1) ("[T]he court *may* impose an appropriate sanction.") (emphasis added); Fed. R. Civ. P. 11, 1993 Advisory Notes (noting that courts should consider the following factors in deciding whether to impose a sanction: "Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants."); *see also Gotro v. R & B Realty Grp.*, 69 F.3d 1485, 1488 (9th Cir. 1995) (noting that district courts have "wide discretion in determining whether Rule 11 sanctions are appropriate"); *Kersten v. Quick Collect, Inc.*, 152 F. Supp. 3d 1301, 1304 (D. Or. 2016) ("Rule 11(c)(1) gives a court discretion to sanction an attorney who files a motion for an improper purpose, 'such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.'" (quoting Fed. R. Civ. P. 11(b)(1))). Furthermore, "[Rule 11] is intentionally drafted to leave the question of the type of remedy to the trial judge's discretion, and not to straitjacket the court by limiting the type or number of sanctions that it is empowered to impose." Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse*, 283 (5th ed. 2018).

In declining to award sanctions, Judge Otero first noted that Ni-Q did not present evidence of Prolacta's improper purpose, such as harassment. *Prolacta*, 2017 WL 5664985,

PAGE 18 – OPINION AND ORDER

at *7. Judge Otero next noted that Ni-Q had not considered documents protected by the attorney work product doctrine, which might support Prolacta's claims. *Id.* Judge Otero concluded: "Though it may be the case that Prolacta could have done more work prior to filing suit to determine whether Ni-Q's products infringe one or more claims of the '921 Patent, the Court is unable to sanction Prolacta at this time." *Id.*

Judge Otero had broad discretion to impose, or decline to impose, Rule 11 sanctions and had numerous factors to consider. His decision does not state precisely what factors he relied on, but the factors that he specifically mentioned are not coextensive with the factors relevant to a consideration of objective baselessness. Accordingly, Judge Otero's denial of Rule 11 sanctions is not "identical" to a finding that Prolacta's conduct was not objectively baseless and does not result in the issue being "necessarily decided" for the purpose of issue preclusion. Prolacta's motion for summary judgment based on issue preclusion is denied.

## CONCLUSION

Defendant Prolacta Bioscience Inc.'s Motion for Partial Summary Judgment (ECF 128) is DENIED.

**IT IS SO ORDERED**.

DATED this 14th day of February, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge