IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NI-Q, LLC**, | Case No. 3:17-cv-934-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PROLACTA BIOSCIENCE, INC.**, | |
| Defendant. | |

Brenna K. Legaard and Angela E. Addae, SCHWABE,WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Plaintiff.

Kristin L. Cleveland, KLARKQUIST SPARKMAN LLP, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; Orion Armon, COOLEY LLP, 380 Interlocken Crescent, Suite 900, Broomfield, CO 80021; Alexandra Mayhugh, COOLEY LLP, 1333 2nd Street, Suite 400, Santa Monica, CA 90401; Nicholas G. Lockhart, COOLEY LLP, 1299 Pennsylvania Avenue, NW, Suite 700, Washington, DC 20004. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this action brought by Plaintiff Ni-Q, LLC ("Ni-Q") against Defendant Prolacta Bioscience, Inc. ("Prolacta"), Ni-Q seeks a declaratory judgment of non-infringement and invalidity of U.S. Patent No. 8,628,921 ("the '921 patent"), and contends that Prolacta violated Oregon's Unlawful Trade Practices Act and Section 2 of the Sherman Act. In response to Prolacta's counterclaims, Ni-Q also asserts an affirmative defense of inequitable conduct,

alleging that Prolacta engaged in fraud on the U.S. Patent and Trademark Office ("PTO") in obtaining the '921 patent, among other patents. The Court granted Ni-Q's first motion for summary judgment, finding that certain claims of the '921 patent were invalid under 35 U.S.C. § 101 and that even if they were not invalid, Ni-Q did not infringe the patent as a matter of law. The Court granted Ni-Q's second motion for summary judgment, finding that certain claims of the '921 Patent were invalid as anticipated under 35 U.S.C. § 102(b) (pre-AIA). Before the Court is Prolacta's motion to dismiss Ni-Q's antitrust claim for failure to state a claim. For the reasons discussed below, Prolacta's motion is DENIED.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

PAGE 2 – OPINION AND ORDER

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## DISCUSSION

Ni-Q alleges attempted monopolization under 15 U.S.C. § 2. "The traditional claim for attempted monopolization occurs when danger of monopolization is clear and present, but before a full-blown monopolization has necessarily been accomplished." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541-42 (9th Cir. 1991). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Prolacta argues that Ni-Q fails to state an antitrust claim for three independent reasons: (A) Ni-Q fails to allege that Prolacta engaged in any predatory or anticompetitive conduct; (B) Ni-Q fails to allege a plausible relevant market protected by barriers to entry, or any dangerous probability that Prolacta would have monopolized that market; and (C) Ni-Q fails to

allege antitrust injury. Ni-Q responds that its allegations sufficiently allege attempted monopolization through a *Walker Process* fraud claim.[1]

A. Anticompetitive Conduct

Prolacta argues that because Ni-Q previously alleged that its entry into the market would not cost Prolacta market share, this assertion necessarily means that Prolacta's conduct could not have been anticompetitive or predatory. In previous iterations of its complaint, Ni-Q alleged:

> Ni-Q is a new company, and a new entrant to the market for human milk-based nutrition for very small preterm infants. Ni-Q currently uses donated human milk to make a safe, nutritionally enhanced food for these infants made entirely of human milk. Because Ni-Q's product is different than Prolacta's fortifier product, and because demand for human milk-based nutrition exceeds Prolacta's supply, Ni-Q's entrance into this market is highly unlikely to cost Prolacta any market share.

*See, e.g.*, ECF 160-1 at ¶ 10.

Prolacta argues that this earlier allegation shows that Ni-Q does not sufficiently allege that it competes with Prolacta in the relevant market and thus that Ni-Q's exclusion from the market "could not have helped [Prolacta] acquire or maintain monopoly power." ECF 176 at 13 (quoting *Nugget Hydroelectric, LP v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 436 (9th Cir. 1992) (alteration added by Prolacta)). The alleged relevant market for Ni-Q's antitrust claim is, however, the market for breast milk having standardized nutritional content within the United States. This is different from Prolacta's *fortifier* product that Ni-Q alleged would likely be unaffected by Ni-Q's "entirely human milk" product. Ni-Q alleges that both Prolacta and Ni-Q sell products within the relevant market (*e.g.*, entirely human breast milk products). *See, e.g.*,

---

[1] The Supreme Court found that enforcement of a fraudulently obtained patent claim could violate the Sherman Act in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

Third Am. Compl. (ECF 172) at ¶¶ 72-73. At this stage of the litigation, Ni-Q sufficiently alleges that it competes with Prolacta.

The anticompetitive or predatory conduct that Ni-Q alleges Prolacta engaged in was using enforcement of multiple fraudulently obtained patents to lessen competition. The fact that Ni-Q asserted that the sale of its products is highly unlikely to reduce Prolacta's market share of fortifier products does not refute Ni-Q's allegation that Prolacta enforced fraudulently obtained patents to lessen competition.

**B. Relevant Market**

**1. Market Definition**

A relevant antitrust market consists of all products that are "reasonably interchangeable by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) ("The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services. Commodities which are 'reasonably interchangeable' for the same or similar uses normally should be included in the same product market for antitrust purposes."). "Reasonable interchangeability" may be determined by looking at price, use, and qualities of the products. *E. I. du Pont*, 351 U.S. at 404. "Ultimately what constitutes a relevant market is a factual determination for the jury." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997); *see also Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) ("The definition of an antitrust 'relevant market' is typically a factual rather than a legal inquiry, but certain legal principals govern the definition." (citing *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

Ni-Q alleges that the relevant market is "the market for breast milk having standardized macronutrient content within the US." Ni-Q quotes Prolacta experts, alleging that breast milk

PAGE 5 – OPINION AND ORDER

with standardized nutrition is an improvement over "non-standardized, non-nutritionally controlled" donor breast milk "because they were nutrient-enhanced to ensure adequate nutritional content, and standardized." Third Am. Compl. at ¶ 72. Ni-Q also quotes other Prolacta personnel, alleging that non-standardized breast milk is "unacceptable" and nutritionally standardized breast milk is "medically superior." *Id.*

Prolacta first argues that Ni-Q's market definition is deficient because if being "medically superior" is the touchstone of the market definition requirement of standardized macronutrient requirements, which excludes regular breast milk, then the DNA matching done by Prolacta should be its own separate market and Prolacta and Ni-Q do not compete in the same market. This argument is somewhat ironic, because Ni-Q did perform DNA matching on its breast milk but stopped after Prolacta enforced its illegal patent claims against Ni-Q. Thus, Prolacta is using the result of its enforcement of its illegal patent claims (getting Ni-Q to stop performing DNA matching) to argue that Prolacta does not violate the Sherman Act by enforcing illegal patents, because it now has a monopoly on the desirable feature of DNA matching. Regardless, this argument is unavailing, because the medical superiority alleged by Ni-Q is the medical need for preterm babies to have standardized nutrition. Although having DNA matching may be a desirable trait, and may be an overall safer option, it is not in the same category of medical need alleged by Ni-Q and the allegations in the Third Amended Complaint do not support that DNA-tested breast milk should be its own market.

Prolacta next argues that the market definition is too narrow because regular breast milk may be reasonably interchangeable with breast milk with standardized nutrition. Prolacta argues that the alleged feature of standardized nutrition is simply a desirable trait. Prolacta asserts that the Third Amended Complaint contains no allegations about the cross-elasticity of breast milk

with standardized nutrition versus other milk products. Ni-Q alleges, however: "While other breast milk banks sell human milk, the nutritional content of the milk is highly variable, making it more difficult to precisely fortify, and therefore it is not a reasonable substitute for the nutritionally standardized milk sold by Prolacta and Ni-Q." Third Am. Compl. at ¶ 72. Ni-Q also alleges statements by Prolacta's experts and officers discussing the importance of standardized nutrition in breast milk for preterm infants and incorporates by reference documents including further statements. *Id.* These allegations are sufficient at this stage of the litigation to allege that non-standardized breast milk is not reasonably interchangeable with nutritionally-standardized breast milk.

### 2. Barriers to Entry

Prolacta argues that Ni-Q fails to allege any barriers to entry of the relevant market. Indeed, argues Prolacta, Ni-Q was able to enter the relevant market. For a *Walker Process* monopolization or attempted monopolization claim, however, a court must "appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved" in order "'to measure [the defendant's] ability to lessen or destroy competition.'" *Spectrum Sports*, 506 U.S. at 455 (alteration in original) (quoting *Walker Process*, 382 U.S. at 177). Thus, the barrier to entry is enforcement of the alleged illegal patent claims. Ni-Q adequately has alleged such a barrier to entry.

### 3. Dangerous Probability of Market Monopolization

Prolacta argues that Ni-Q fails to allege a dangerous probability that Prolacta would monopolize the market because Ni-Q stopped performing DNA matching to "design around" Prolacta's patent and continue selling in the market. Prolacta also notes that Ni-Q alleges that it was "extremely confident" that it was not infringing Prolacta's patent. Thus, argues Prolacta, Ni-Q fails to allege that Prolacta was in danger of excluding Ni-Q and monopolizing the market.

PAGE 7 – OPINION AND ORDER

Prolacta contends that Ni-Q's allegations undermine the theory that Prolacta's monopolization was possible, let alone probable.

Ni-Q responds that the fact that it had to stop performing the desirable function of DNA testing supports its claim of attempted monopolization. Ni-Q also argues that its allegations that Prolacta claims approximately 90 percent of the market, dominates the market, and uses legal actions enforcing fraudulently obtained patents to lessen competition all support that Prolacta has a dangerous probability of success. Ni-Q asserts that the mere fact that Prolacta was unsuccessful in thwarting Ni-Q from entering the market does not preclude a Sherman Act claim and is why "attempted" monopolization claims exist.

"[T]he plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power." *Spectrum Sports*, 506 U.S. at 455. For *Walker Process* attempted monopolization, this analysis includes evaluating the relevant market, the product involved, and the exclusionary power of the illegal patent claim. *Id.* Ni-Q's allegations that Prolacta enforced illegal patents to lessen competition shows the necessary intent, and the allegation that Prolacta had a 90 percent market share is sufficient to show dangerous probability of success. *See, e.g.*, *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 846 (9th Cir. 1980) ("The allegation of a 90% share of the California market in regional shopping centers shows sufficient probability to withstand a motion to dismiss the complaint."). Considering the relevant market, the product involved, the alleged market power of Prolacta, and the exclusionary power of the illegal patent claims, the Court finds that Ni-Q's antitrust allegations are sufficient to withstand a motion to dismiss.

### C. Antitrust Injury

Prolacta argues that Ni-Q fails to allege harm to competition. Prolacta argues that Ni-Q fails to allege any effect on competition, such as higher market prices, and that the only harm alleged is harm to Ni-Q through attorney's fees, lost revenue, and reputational harm. Prolacta asserts that this is harm to a *competitor*, and not harm to *competition*, which is required for antitrust injury.

The Court previously rejected this argument in resolving Ni-Q's motion to amend to add the antitrust claim, relying primarily on the Federal Circuit's opinion in *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295 (Fed. Cir. 2016). Prolacta essentially urges the Court not to follow *TransWeb*, and argues that *TransWeb* involved antitrust *damages* and not antitrust *injury*. Although the issue *TransWeb* ultimately involved damages, the passage relied on by the Court in its opinion granting the motion to amend discussed antitrust injury.

The Court declines to reconsider this issue. At this stage of the litigation, Ni-Q sufficiently has alleged antitrust injury. *See TransWeb*, 812 F.3d at 1309 ("Therefore, TransWeb's attorney fees are both injury-in-fact and antitrust injury."); *Avocent Huntsville, LLC v. ZPE Sys., Inc.*, 2018 WL 4859527, at *15 (N.D. Cal. July 23, 2018) ("As the Federal Circuit recently held, when an antitrust defendant's unlawful act is 'the bringing of suit based on a patent known to be fraudulently obtained[,]' attorney fees flow directly from the defendant's attempt to gain a monopoly and 'are precisely the type of loss that the claimed violations would be likely to cause[.]' In the particular circumstances of *Walker Process* antitrust claim where a patentee 'attempt[s] to gain a monopoly based on [a] fraudulently-obtained patent[,]' ZPE has adequately pleaded an antitrust injury." (alterations in original) (quoting *TransWeb*, 812 F.3d at 1309-10) (citations omitted)); *Quest Integrity USA, LLC v. A.Hak Indus. Servs. US, LLC*, 2016 WL 4533067, at *5 (W.D. Wash. Apr. 8, 2016) ("In any event, however, the Federal Circuit has

recently suggested that attorneys' fees may form the basis for antitrust injury and injury-in-fact on a *Walker Process* claim."); *Allflex USA, Inc. v. Avid Identification Sys., Inc.*, 2011 WL 11004270, at *12 (C.D. Cal. Feb. 11, 2011) ("The Court notes that if Allflex can prove that Avid enforced its patents against Allflex in bad faith and in violation of the antitrust laws, the costs Allflex incurred in defending against allegations of patent infringement constitute antitrust injury.").

## CONCLUSION

Prolacta's Motion to Dismiss its Complaint (ECF 176) is DENIED.

**IT IS SO ORDERED.**

DATED this 29th day of January, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge