# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NI-Q, LLC**, | Case No. 3:17-cv-934-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PROLACTA BIOSCIENCE, INC.**, | |
| Defendant. | |

Brenna K. Legaard, K & L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97204. Of Attorneys for Plaintiff.

Kristin L. Cleveland, KLARKQUIST SPARKMAN LLP, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; Orion Armon, COOLEY LLP, 1144 15th Street, Suite 2300, Denver, CO 80202; Alexandra Mayhugh, COOLEY LLP, 1333 2nd Street, Suite 400, Santa Monica, CA 90401; David Burns and M. Howard Morse, COOLEY LLP, 1299 Pennsylvania Avenue, NW, Suite 700, Washington, DC 20004. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this action brought by Plaintiff Ni-Q, LLC (Ni-Q) against Defendant Prolacta Bioscience, Inc. (Prolacta), Ni-Q sought a declaratory judgment of non-infringement and invalidity of U.S. Patent No. 8,628,921 (the '921 Patent). Prolacta asserted a counterclaim for infringement of that patent. The Court granted Ni-Q's first motion for partial summary judgment, finding that certain claims of the '921 Patent were invalid under 35 U.S.C. § 101 and that even if they were valid, Ni-Q did not infringe the '921 Patent as a matter of law. The Court also granted Ni-Q's second motion for partial summary judgment, finding that certain claims of the '921 Patent were invalid as anticipated under 35 U.S.C. § 102(b) (pre-America Invents Act).

Upon the stipulated request of the parties, the Court dismissed Ni-Q's claims requesting a declaratory judgment of non-infringement and invalidity as moot, after Prolacta surrendered the '921 Patent during reissue, when the U.S. Patent and Trademark Officer (USPTO) issued the RE48,240 patent. The Court also dismissed Prolacta's counterclaim for infringement of the '921 Patent.

In its Third Amended Complaint, Ni-Q added claims asserting that Prolacta violated Oregon's Unlawful Trade Practices Act (UTPA) and Section 2 of the Sherman Act, 15 U.S.C. § 2, alleging a *Walker Process* claim of enforcement of a fraudulently obtained patent.[1] Ni-Q, however, has stated that it will voluntarily dismiss its UTPA claim, leaving only its antitrust claim. In response to Prolacta's counterclaim, Ni-Q also asserted an affirmative defense of inequitable conduct, alleging that Prolacta engaged in fraud on the USPTO in obtaining the '921 Patent, among other patents.

Now before the Court is Ni-Q's third motion for summary judgment, arguing that the '921 Patent is unenforceable because of Prolacta's inequitable conduct, Ni-Q's fourth motion for summary judgment, on its antitrust claim, and Ni-Q's motion for leave to file a supplemental complaint adding a claim for a declaratory judgment that the '921 Patent is unenforceable because of inequitable conduct and that Prolacta engaged in fraud on the PTO during the reissue of the '921 Patent. For the following reasons, Ni-Q's motion for leave to file a supplemental complaint is denied, Ni-Q's third motion for summary judgment is denied as moot, and Ni-Q's fourth motion for summary judgment is denied.

---

[1] In *Walker Process Equipment v. Food Machine & Chemical Corp*., 382 U.S. 172 (1965), the Supreme Court held that a plaintiff could sue under § 2 of the Sherman Act based on the alleged maintenance and enforcement of a fraudulently obtained patent.

**STANDARDS**

**A.  Summary Judgment**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

**B.  Supplemental Pleading**

Rule 15(d) of the Federal Rules of Civil Procedure provides that a court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." This rule also "permits a supplemental pleading to correct a defective complaint and circumvents 'the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief'" *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1044 (9th Cir. 2015) (quoting 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Fed. Prac. & Proc.* § 1505 (3d ed. 2015) (Wright & Miller)). "The purpose of Rule 15(d) is to promote as

complete an adjudication of the dispute between the parties as is possible." *LaSalvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1119 (9th Cir. 1986) (simplified).

Amended pleadings under Rule 15(a) differ from supplemental pleadings under Rule 15(d). "The former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading; the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings." Wright & Miller, § 1504.

## DISCUSSION

### A. Motion to File Supplemental Complaint

Ni-Q moves for leave to file a supplemental complaint alleging a claim for inequitable conduct. Much of the conduct alleged in the proposed supplemental claim, however, is conduct that occurred before the date that the Third Amended Complaint was filed.[2] A supplemental pleading is the mechanism used for events, transactions, and occurrences that happened *after* the date of the pleading to be supplemented. *Id.*; *see also LaSalvia*, 804 F.2d at 1119 ("Federal Rule of Civil Procedure 15(d) allows the addition of *post-complaint allegations*." (emphasis added)). Indeed, Rule 15(d) is "somewhat narrower in scope" than the rule it replaced, "because it does not expressly apply to pre-action matters of which a party was ignorant at the time the original pleading was filed (these matters may be raised under Rule 15(a)) but embraces only events that have happened 'after the date of the pleading to be supplemented.'" *Wright & Miller* § 1504.

---

[2] Ni-Q alleges a few facts relating to the reissue of the '921 Patent that may have occurred after the filing of the Third Amended Complaint (those facts do not have specific dates, but given the timing of the reissue patent prosecution, the alleged conduct is likely to have occurred after October 2019). The core of Ni-Q's proposed inequitable conduct claim, however, is that Prolacta engaged in inequitable conduct in originally prosecuting the '921 Patent, which occurred well before the filing of the Third Amended Complaint. Indeed, Ni-Q included most of the same allegations in its inequitable conduct affirmative defense to Prolacta's counterclaim.

That the alleged conduct is not post-complaint conduct is apparent by the fact that Ni-Q asserts nearly identical allegations in its affirmative defense of inequitable conduct to Prolacta's counterclaim. Thus, the proper mechanism was for Ni-Q to move for leave to file a Fourth Amended Complaint.

Additionally, even considering Ni-Q's request on the merits, or construing Ni-Q's request as one under Rule 15(a) of the Federal Rules of Civil Procedure instead of under Rule 15(d), the Court would deny the request as moot, untimely, and unduly prejudicial. The sole basis on which Ni-Q asserts that it should be able to add a new claim four years into this litigation is an anticipated motion for attorney's fees under 35 U.S.C. § 285. The Court, however, will consider Ni-Q's arguments and evidence relating to inequitable conduct when such a motion is filed. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1383 (Fed. Cir. 2007) ("We agree with the district court that the inequitable conduct counterclaim is moot. . . . The only other additional relief that may be available to Medrad by an inequitable conduct determination is attorney fees under 35 U.S.C. § 285. Medrad admitted during oral arguments that, although it plans to predicate an attorney fee application on inequitable conduct, it has not filed that application yet. We therefore affirm the decision that the inequitable conduct counterclaim is presently moot.").

## B.  Motions for Summary Judgment

### 1.  Inequitable Conduct

Ni-Q filed its motion for summary judgment on its affirmative defense of inequitable conduct before the parties stipulated that the Court should dismiss Ni-Q's declaratory judgment claims on infringement and invalidity and Prolacta's counterclaim. Ni-Q argued in its motion that the '921 Patent was unenforceable because of Prolacta's inequitable conduct. The Court requested supplemental briefing on the legal effect, if any, of the Court ruling on Ni-Q's summary judgment motion after the Court dismissed Ni-Q's claims relating to infringement and

invalidity and Prolacta's counterclaim. Ni-Q cites *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229 (Fed. Cir. 2008), in support of the proposition that the Court should resolve this motion and find the '921 Patent unenforceable.

*Monsanto* does not support Ni-Q's assertion that a court can, independent of a motion for attorney's fees under § 285, find a patent that is not in suit unenforceable for inequitable conduct. As the Federal Circuit explained in *Monsanto*:

> The question facing this court is, thus, whether a district court's jurisdiction under § 285 to determine whether there was inequitable conduct in the prosecution of patents that are otherwise no longer in suit confers on that court the jurisdiction to hold such patents unenforceable for inequitable conduct. We hold that it does.

*Id.* at 1243. The prerequisite in *Monsanto* for the court having jurisdiction to hold the patent that was no longer in suit unenforceable was the existence of a pending motion under § 285. Here, Ni-Q has not yet filed a motion under § 285.[3]

Ni-Q's affirmative defense of inequitable conduct to claimed infringement by Prolacata is moot because the '921 Patent is no longer in suit, Ni-Q's declaratory judgment claims have been dismissed, and Prolacata's infringement counterclaim has been dismissed. Thus, Ni-Q's motion for summary judgment is denied as moot. As discussed above, the Court will consider Ni-Q's arguments relating to inequitable conduct, including whether such conduct rendered the '921 Patent unenforceable, in any future motion under § 285.

---

[3] Ni-Q also cites *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817 (Fed. Cir. 2010). Like in *Monsanto*, the jurisdiction for the court in *Advanced Magnetic* to make findings on inequitable conduct and unenforceability on a patent not in suit stemmed from the presence of a filed motion under § 285. *Id.* at 827 ("This court has held that a district court retains jurisdiction to consider a motion for attorney's fees under 35 U.S.C. § 285 and to make findings of inequitable conduct—even after a party has dismissed its counterclaims as to that patent.").

### 2. Antitrust

Ni-Q's Third Amended Complaint alleges that Prolacta engaged in fraud on the USPTO and attempted monopolization under 15 U.S.C. § 2 based on the fraudulently obtained patent. Ni-Q alleges that the relevant market is "the market for breast milk having standardized macronutrient content within the US." Third Am. Compl. ¶ 72. In Ni-Q's motion for summary judgment, however, Ni-Q argues that Prolacta has engaged in monopolization (instead of attempted monopolization) and that the relevant market is "DNA-matched, nutrient standardized human breast milk." It troubles the Court that Ni-Q's changed its antitrust theory and asserted relevant market definition after the close of fact discovery.[4] Prolacta, however, responded to Ni-Q's motion on the merits, although Prolacta reserved its rights under Rule 37(c) of the Federal Rules of Civil Procedure to exclude Ni-Q's "late" assertion of a revised antitrust theory and new market definition. Because Prolacta did not challenge Ni-Q's late changes of its relevant market definition and antitrust theory, the Court will address these issues on the merits of Ni-Q's motion for summary judgment.

"In order to prevail on a *Walker Process* claim, the antitrust-plaintiff must show two things: first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). "To state an antitrust claim of monopolization under § 2 of the Sherman Act, a plaintiff must show: '(a) the possession of monopoly power in the relevant market; (b) the willful

---

[4] Fact discovery closed on July 31, 2020. Ni-Q disclosed its new asserted relevant market to Prolacta on August 27, 2020, through Supplemental Interrogatory responses. Ni-Q filed its motion for summary judgment on its antitrust claim on September 18, 2020.

acquisition or maintenance of that power; and (c) causal antitrust injury.'" *Unigestion Holdings,*
*S.A. v. UPM Tech., Inc.*, 412 F. Supp. 3d 1273, 1284 (D. Or. 2019) (quoting *Somers v. Apple,*
*Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)).

Prolacta argues that there are disputed issues of material fact on all the elements of Ni-
Q's *Walker Process* antitrust claim—whether Prolacta engaged in the requisite fraud, whether
Prolacta has monopoly power in an appropriately defined relevant market, and whether there is
antitrust injury. Because the Court finds that there is a disputed issue of material fact on the
definition of the relevant market, the Court need not reach Prolacta's remaining arguments.

A relevant antitrust market consists of all products that are "reasonably interchangeable
by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351
U.S. 377, 395 (1956); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979)
("The principle most fundamental to product market definition is 'cross-elasticity of demand' for
certain products or services. Commodities which are 'reasonably interchangeable' for the same
or similar uses normally should be included in the same product market for antitrust purposes.").
"Reasonable interchangeability" may be determined by looking at price, use, and qualities of the
products. *E. I. du Pont*, 351 U.S. at 404. "Ultimately what constitutes a relevant market is a
factual determination for the jury." *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d
1195, 1203 (9th Cir. 1997); *see also Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196
(N.D. Cal. 2008) ("The definition of an antitrust 'relevant market' is typically a factual rather
than a legal inquiry, but certain legal principals govern the definition." (citing *Newcal Indus.,*
*Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

Ni-Q argues that the relevant market is a submarket of milk products, or even human
breast milk, that is bought to feed to neonates and must contain all three attributes that Prolacta
has included in the '921 Patent—standardized nutrients, DNA matching, and human breast milk.

Focusing on "technological, rather than economic, substitution is," however, "a fatal flaw in establishing [the] proposed market definition." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006). Additionally, the evidence shows that there are material disputes about whether Ni-Q's proposal is a proper submarket definition.

At its essence, Ni-Q's argument and evidence relating to relevant market definition is that Prolacta "DNA-matches" when no other supplier of human breast milk does so and that some customers are willing, at least on occasion, to pay a premium for Prolacta's DNA-matched products. From this, Ni-Q asserts that it has provided a proper definition of a relevant submarket. If the issue before the Court was whether such a proposed definition is sufficient to withstand a motion to dismiss, Ni_Q would likely prevail. That is not, however, the current procedural posture. Ni-Q, as the plaintiff in an antitrust claim, is seeking summary judgment in its favor. Thus, the relevant question is whether, as a matter of law, Ni-Q's proposed market definition is the only reasonable definition supported by the facts or whether a jury must decide the most appropriate market definition supported by the facts. Moreover, at summary judgment, the Court must view the facts in the light most favorable to the nonmoving party and resolve all reasonable inferences in favor of the nonmoving party. This presents a very steep burden for Ni-Q at this stage of the proceedings.

Ni-Q appears to argue (or assume) that any patented product that is mildly commercially successful must be in a unique (and single-seller) market for purposes of the antitrust laws. That is not, however, how markets are defined under the antitrust laws. *Accord In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 993 (C.D. Cal. 2012) (finding that the expert's analysis of the relevant product market "failed to provide any meaningful discussion as to whether and how any such indicia are 'economically significant' in this particular case" and instead "essentially

boils down to: plenty of people (including consumers and industry participants) recognize 'rock' as a type of music; therefore, the relevant market in this case is comprised of 'live rock music concerts'"). Ni-Q's proposed market definition (even for a submarket) ignores record evidence that *consumers* consider donated human breast milk products, whether pasteurized, sterilized, "DNA-matched," or with standardized nutrition or fortified after purchase, all to be reasonably interchangeable. For example, Dr. William Rhine, of Lucile Salter Packard Children's Hospital at Stanford University, an expert who has submitted declarations on behalf of Prolacta on the benefits of human breast milk, standardized nutrients, and DNA tested breast milk, testified at deposition that his hospital uses donated breast milk from the Human Milk Banking Association of North America (HMBANA), and fortifies it. ECF 219-9 at 6-8. Additionally, Ni-Q's designated corporate representative at Ni-Q's deposition under Rule 30(b)(6) testified that HMBANA milk that is fortified meets the standard of care in the industry. ECF 220-1 at 28-29. He also testified that customers view all donated breast milk, including through HMBANA, as "equal," "substitutes," the "same across the board," and that customers "believe that if they are getting milk from a HMBANA bank that it's the same as milk as Prolacta, that it's the same milk from Ni-Q." *Id.* at 44-46; *see also* ECF 206 at 2 (Ni-Q's Chief Executive Officer explaining in his Declaration that hospitals that want to "feed babies a human milk diet" can choose milk from HMBANA, Prolacta, Ni-Q, or Medolac). Indeed, the evidence shows that by far HMBANA has the largest market share of sales of donated human breast milk. HMBANA milk is pasteurized but not sterilized or DNA tested, and it does not have standardized nutrition. That some customers, on some occasions, might prefer and buy human breast milk that is sterilized or DNA-matched and has standardized nutrition does not mean that it is undisputed that all three attributes constitute a relevant submarket for antitrust purposes. The key question is whether consumers consider these breast milk products to be reasonably interchangeable, at least

depending upon respective prices. The whole point of defining a relevant market (or submarket) for antitrust purposes is to determine which products have the ability or potential to assert a competitive influence on the pricing decisions of the products of an antitrust defendant. "A firm with market power can profitably increase its price above the competitive level for a sustained period of time." ABA ANTITRUST LAW SECTION, Monopolization and Dominance Handbook 7 (2d ed. 2021).

Ni-Q also ignores evidence in the record that the sterilization of breast milk performed by Ni-Q and Medolac replaces the DNA matching performed by Prolacta and renders that attribute unnecessary and broadening the correct market definition. Thus, there is an issue of fact whether human breast milk that is sterilized is reasonably interchangeable with human breast milk that is DNA-matched, even if standardized nutrition were an appropriate attribute for a submarket.

Moreover, Ni-Q relies on Prolacta's pricing to argue monopolization, but the evidence on pricing is disputed and ambiguous. The evidence shows that some of Prolacta's pricing is high but sometimes it is discounted and sometimes Ni-Q has higher pricing than Prolacta on some products. HMBANA, however, has much lower prices, and the evidence does not show that Prolacta can unilaterally price its products however it likes based on monopoly power. Indeed, Prolacta lowered its prices because of pricing pressure from HMBANA's products.

Viewed in the light most favorable to the nonmoving party, the evidence shows that consumers of Prolacta's products have alternatives in human breast milk products from Ni-Q, Medolac, and HMBANA.[5] This is sufficient to show a genuine dispute on the question of market definition. Although Prolacta's products may have some different attributes, "where there are

---

[5] Consumers also may have reasonable alternatives to Prolacta's products from formula based on cow's milk, although there is a stronger argument that those alternatives could be considered part of a separate product market.

market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others." *E.I. du Pont*, 351 U.S. at 394.

Ni-Q also argues that its proposed submarket definition is proper under *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). In *Brown Shoe*, the Supreme Court explained that within a broad market, well-defined submarkets may exist that themselves constitute markets for antitrust purposes. *Id.* at 325. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* The Ninth Circuit, however, has "repeatedly noted that the *Brown Shoe* indicia are practical aids for identifying the areas of actual or potential competition and that their presence or absence does not decide automatically the submarket issue." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375 (9th Cir. 1989). Instead, "[w]hether isolating a submarket is justified turns ultimately upon whether the factors used to define the submarket are 'economically significant.'" *Id.* There are questions of fact for the jury to decide.

A review of the *Brown Shoe* factors shows that they do not support finding Ni-Q's proposed submarket is the only properly defined market (or even submarket), which is required for Ni-Q to prevail at summary judgment. The first factor, public recognition of a separate submarket, is not undisputed. Indeed, there is no evidence in the record, let alone undisputed evidence, that customers or suppliers consider DNA-matched, nutrient standardized human breast milk to be its own relevant submarket. Instead, as previously discussed, the evidence shows that customers view human breast milk products interchangeably. There also is evidence that suppliers, including both Ni-Q and Prolacta, consider HMBANA to be a primary competitor.

*See, e.g.*, ECF 220-1 at 31-32 (Ni-Q's corporate designee discussing HMBANA, Prolacta, and Medolac as Ni-Q's competitors); ECF 204 at 5 (Ni-Q stating that Prolacta "regards HMBANA as its primary competitor"); ECF 205-1 at 4 (Prolacta's corporate designee testifying that Prolacta competes with HMBANA).

The second factor, the product's peculiar characteristics and uses, also involves disputed issues of material fact. As noted, there is evidence that sterilization replaces DNA matching. This supports the conclusion that any potential submarket would include at least products that are *either* DNA-matched or sterilized candidates. There also is some evidence that consumers do not find the attributes of sterilization or DNA matching, or nutrient standardization, economically significant. That suggests there should be no submarket for a premium donated breast milk containing any of these attributes. *See, e.g.*, *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd sub nom Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (Table). Thus, there are disputed issues of fact regarding this factor and it does not support Ni-Q's proposed submarket definition.

For the third factor, unique production facilities, Ni-Q does not provide argument or evidence that Prolacta's facilities are unique. For the fourth factor, distinct customers, Ni-Q does not argue, let alone provide undisputed evidence, that Prolacta's customers are distinct from other breast milk customers. The customers are the same—neonatal intensive care units and similar facilities and their patients. At most, Ni-Q shows that at least some of these customers are willing some of the time to pay more for Prolacta's products. But these are the same customers who also purchase Ni-Q's, Medolac's, and HMBANA's products. Ni-Q does not argue, or provide evidence, that it is undisputed that there is a subset of customers for whom Prolacta's products are the *only reasonable* alternative. *See, e.g.*, ECF 218 at 20-25 (Declaration of

Margaret E. Guerin-Calvert, President and Senior Managing Director of FTI Consulting, Inc.'s
Center for Healthcare Economics and Policy, Prolacta's economics expert, explaining how
Prolacta's customers are not captive).

For the fifth factor, distinct prices, Ni-Q relies on the fact that Prolacta's list prices are
higher than Ni-Q's and Medolac's. Ni-Q argues that the fact that Prolacta charges higher prices
means that it monopolizes the market. As noted, the price information is not as clear as presented
by Ni-Q; both Ni-Q and Prolacta have a range of prices. Further, "the scope of the relevant
market is not governed by the presence of a price differential between competing products."
*Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975).

For the sixth factor, sensitivity to price changes, Ni-Q does not provide any economic
evidence that Prolacta's prices are not sensitive to price changes. Ni-Q argues that it does not
need economic evidence because Prolacta charges higher prices. That, however, is not the
question. For this factor, courts "typically consider whether a sufficient number of customers
would switch to other technologies in response to a price increase. If enough customers switch,
then [the product does] not constitute an independent market." *DSM Desotech Inc. v. 3D Sys.
Corp.*, 749 F.3d 1332, 1343-44 (Fed. Cir. 2014). Here, the evidence shows that changes in the
prices charged by Prolacta for its products can, and do, cause customers to switch to those other
products. Ni-Q admits that Prolacta lowered its prices to better compete with HMBANA, and
Prolacta's corporate designee testified to that fact. *See, e.g.*, ECF 205-1 at 12 (Prolacta's
corporate designee testifying that market for Prolacta's products is a "price-sensitive market" and
that Prolacta lowered its prices in 2016 after conducting a market survey and "consider[ing]
HMBANA's pricing"); *accord* ECF 218 at 23 (Prolacta's economics expert discussing how a
large percentage of Prolacta's customers switched to purchasing competitors' products

between 2016 and June 2020). Thus, it is a disputed issue of fact whether a price increase of Prolacta's products would cause customers to switch to competitor's products.

For the seventh factor, distinct vendors, Ni-Q argues that the vendors are distinct because HMBANA does not standardize nutrition or match DNA and Ni-Q and Medolac do not match DNA. That argument relates to the *product's* peculiar characteristics. Ni-Q does not argue or present evidence that the *vendors* are distinct.

As noted, at summary judgment the facts must be viewed in the light most favorable to the nonmoving party, which is Prolacta. Ni-Q has not met its burden of proving a relevant market (or even submarket) as a matter of law. *See, e.g.*, ECF 218 at 1-25 (Prolacta's economics expert explaining why Ni-Q's proposed market definition is an improper antitrust market definition). A jury will need to decide that question.

## CONCLUSION

The Court DENIES Plaintiff's Motion for Leave to File a Supplemental Complaint (ECF 236). The Court DENIES AS MOOT Plaintiff's Motion for Summary Judgment that U.S. Patent No. 8,628,921 is Unenforceable Due to Inequitable Conduct (ECF 201). The Court DENIES Plaintiff's Motion for Summary Judgment as to Its Sherman Antitrust Act Claim (ECF 204).

**IT IS SO ORDERED**.

DATED this 26th day of July, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge