IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NI-Q, LLC,

              Plaintiff,

    v.

PROLACTA BIOSCIENCE, INC.,

        Defendant.

Case No. 3:17-cv-934-SI

**OPINION AND ORDER**

Brenna K. Legaard, K & L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97204. Of Attorneys for Plaintiff.

Kristin L. Cleveland, KLARKQUIST SPARKMAN LLP, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; Orion Armon, COOLEY LLP, 1144 15th Street, Suite 2300, Denver, CO 80202; Alexandra Mayhugh, COOLEY LLP, 1333 2nd Street, Suite 400, Santa Monica, CA 90401; David Burns and M. Howard Morse, COOLEY LLP, 1299 Pennsylvania Avenue NW, Suite 700, Washington, DC 20004. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      In this action brought by Plaintiff Ni-Q, LLC (Ni-Q) against Defendant Prolacta

Bioscience, Inc. (Prolacta), Ni-Q sought a declaratory judgment of non-infringement and

invalidity of U.S. Patent No. 8,628,921 (the '921 Patent). Prolacta asserted a counterclaim for

infringement of that patent. The Court granted Ni-Q's first motion for partial summary judgment,

finding that certain claims of the '921 Patent were invalid under 35 U.S.C. § 101 and that even if

they were valid, Ni-Q did not infringe the '921 Patent as a matter of law. The Court also granted

Ni-Q's second motion for partial summary judgment, finding that certain claims of the '921

Patent were invalid as anticipated under 35 U.S.C. § 102(b) (pre-America Invents Act).

Upon the stipulated request of the parties, the Court dismissed as moot Ni-Q's claims

requesting a declaratory judgment of non-infringement and invalidity, after Prolacta surrendered

the '921 Patent during reissue and the U.S. Patent and Trademark Office (PTO) issued the

RE48,240 patent (Reissue Patent). The Court also dismissed Prolacta's counterclaim for

infringement of the '921 Patent.

In its Third Amended Complaint, Ni-Q added claims asserting that Prolacta violated

Oregon's Unlawful Trade Practices Act (UTPA) and Section 2 of the Sherman Act, 15

U.S.C. § 2, alleging a *Walker Process* claim of enforcement of a fraudulently obtained patent.[1]

Ni-Q moved for partial summary judgment in its favor on its antitrust claim and noted that if it

did not prevail in that motion, Ni-Q would voluntarily dismiss its antitrust and UTPA claims. In

response to Prolacta's counterclaim, Ni-Q also asserted an affirmative defense of inequitable

conduct, alleging that Prolacta engaged in fraud on the PTO in obtaining the '921 Patent, among

other patents. The Court denied Ni-Q's motion for partial summary judgment and subsequently

granted Ni-Q's motion to voluntarily dismiss its antitrust and UTPA claims.

Now before the Court is Ni-Q's motion for attorney's fees related to the patent claims.

Ni-Q argues that this case is "exceptional" under 35 U.S.C. § 285 on the grounds that Prolacta

engaged in inequitable conduct in originally prosecuting four patents related to the '921 Patent

---

[1] In *Walker Process Equipment v. Food Machine & Chemical Corp.*, 382 U.S. 172 (1965), the Supreme Court held that a plaintiff could sue under § 2 of the Sherman Act based on the alleged maintenance and enforcement of a fraudulently obtained patent.

and during the reissue proceedings of the '921 Patent that resulted in the Reissue Patent.[2] Ni-Q requests fees in the amount of $512,524.91. For the following reasons, the Court finds that Ni-Q fails to meet its burden of showing by clear and convincing evidence that Prolacta engaged in inequitable conduct. Accordingly, the Court denies Ni-Q's motion for attorney's fees.

## STANDARDS

### A.  Exceptional Case Status and Attorney's Fees Under 35 U.S.C. § 285

Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). A court "should determine whether a case is exceptional on a case-by-case basis, considering the totality of the circumstances." *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1371, 1373 (Fed. Cir. 2019). Such circumstances may include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 572 U.S. at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

### B.  Inequitable Conduct

To show inequitable conduct, "the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). "The accused infringer must prove both elements—intent and materiality—by clear and convincing

---

[2] Ni-Q does not assert or argue any basis other than inequitable conduct for the Court to find exceptional circumstances in this case.

evidence." *Id.* These are separate elements. *Id.* at 1290. "[A] court must weigh the evidence of intent to deceive independent of its analysis of materiality." *Id.* "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference." *Id.* at 1290 (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (emphasis added in *Therasense*). "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.*

"Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id.* (citation and quotation marks omitted). This means that when multiple reasonable inferences can be drawn, intent to deceive cannot be found. *Id.* "[T]he evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Id.* (emphasis in original) (quotation marks omitted). Generally, "the materiality required to establish inequitable conduct is but-for materiality." *Id.* at 1291.

"When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* In making this assessment, a court applies the preponderance of the evidence standard, and gives the patent claims their broadest interpretation. *Id.* at 1291-92. In cases of "affirmative egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Id.* at 1292. If the party asserting inequitable conduct meets its burden to prove both elements, then the court "must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." *Id.* at 1287.

**DISCUSSION**

Ni-Q argues that the Court should consider Prolacta's conduct in prosecuting all the related patents to the '921 Patent in its review under § 285 because Prolacta originally accused Ni-Q of infringing all of its patents, the alleged inequitable conduct bears an immediate and necessary relation to the enforcement of the related patents, Prolacta's purported pattern of inequitable conduct is relevant to the totality of the circumstances the Court should consider in evaluating whether exceptional circumstances exist, and the Court can invalidate all related patents that are in the same technology family if the Court finds inequitable conduct under *Therasense*. *See Therasense*, 649 F.3d at 1288-89 ("[T]he taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family."). Ni-Q contends that Prolacta repeatedly engaged in inequitable conduct by omitting to disclose material information and making misrepresentations to the PTO and such conduct supports a finding of inequitable conduct and a conclusion that this case is exceptional under § 285 warranting attorney's fees.

Prolacta responds that Ni-Q is not the prevailing party in this case. Prolacta also argues that the Court may not reach Ni-Q's motion on the merits because Ni-Q dismissed its claims. The Court, however, already determined that it may address Ni-Q's motion on the merits. *See Ni-Q, LLC v. Prolacta Bioscience, Inc.*, 2021 WL 3145968, at *2-3 (D. Or. July 26, 2021). Prolacta further responds that if Ni-Q is the prevailing party and the Court reaches Ni-Q's motion on the merits, the Court does not have jurisdiction over the non-asserted patents and Ni-Q fails to prove inequitable conduct. The Court first addresses Prolacta's arguments regarding prevailing party status and whether the Court may consider the unasserted patents and then addresses Ni-Q's motion on the merits by considering the two factors—materiality and intent.

### A. Prevailing Party

Prolacta argues that Ni-Q is not the prevailing party on the patent claims of this case because Ni-Q's declaratory judgment claims were denied as moot after the reissue of the patent. The Court rejects this argument.

The Supreme Court has counseled courts to use a "common-sense" approach to prevailing party status. *See CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 431 (2016). The Federal Circuit has also rejected an argument that "puts form over substance and conflicts with the common-sense approach outlined in *CRST*," holding that a party prevails when the court "placed a judicial imprimatur upon [that party's] claim for patent infringement." *B.E. Tech., L.L.C. v. Facebook, Inc.*, 940 F.3d 675, 679 (Fed. Cir. 2019). In *B.E.*, the defendant was determined to be the prevailing party when the district court dismissed the federal case as moot after a decision by the PTO, but the district court had not previously granted summary judgment in favor of the plaintiff.

Here, Ni-Q twice prevailed at summary judgment. The Court first found that some claims of Prolacta's '921 Patent were invalid as nonpatentable under § 101 and also that Ni-Q did not infringe the patent as a matter of law. The Court next found that some claims of the '921 Patent were invalid as anticipated under § 102(b). This was the crux of Ni-Q's claim for declaratory action and Prolacta's counterclaim for infringement, and Ni-Q received this Court's judicial imprimatur in favor of Ni-Q's position. The fact that ultimately that victory was rendered moot by Prolacta's reissue proceeding does not detract from Ni-Q being the prevailing party in this case on the claim and counterclaim relating to infringement.

### B. Other Patents

Prolacta also argues that the Court does not have jurisdiction to consider other patents not in suit. The '921 Patent is the only patent-in-suit in this case. Ni-Q disagrees with Prolacta's

position, first arguing that if the '921 Patent is unenforceable because of inequitable conduct, then the Court can find related patents unenforceable. That, however, does not give the Court jurisdiction to consider Prolacta's conduct in prosecuting other patents when evaluating whether Prolacta engaged in inequitable conduct in prosecuting the '921 Patent in the first instance.

Ni-Q next argues that the Court can consider Prolacta's conduct in prosecuting other patents in evaluating the totality of the circumstances of Prolacta's inequitable conduct. The totality of the circumstances, however, is the totality of the circumstances relating to Prolacta's alleged inequitable conduct giving rise to Ni-Q's claim under § 285, which relates only to the patent-in-suit in this case, the '921 Patent. Ni-Q argues that the Court can look at Prolacta's conduct in unasserted patents, but the cases cited by Ni-Q either involve *asserted* patents-in-suit or have considered conduct in unasserted related patents only after finding suspect conduct in the patent-in-suit, and considering the other patents as supporting evidence of intent or falsehood. *See, e.g.*, *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1344 (Fed. Cir. 2013) ("The court found that, given the pattern of false and misleading statements during prosecution of related patents, Mr. Henderson's explanations for the misrepresentations during prosecution of the asserted patents were not credible. The court therefore concluded that intent to deceive the PTO was the single most reasonable inference from Mr. Henderson's false assertions." (citation omitted)); *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007) ("It was not an abuse of discretion for the district court, when these patents were sued upon and maintained in the suit up until just before trial, to hold these four patents unenforceable . . . ."); *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) (holding plaintiff's "concealment of the CS1-B slurry from the '917 patent permeated the prosecution of the other

patents-in-suit and renders them unenforceable").[3] Thus, the Court here does not consider

Prolacta's alleged conduct in prosecuting *other* patents to determine whether Prolacta was

engaged in inequitable conduct with respect to the '921 Patent or the Reissue Patent, at least until

after considering whether there was, as a threshold matter, suspect conduct in the prosecution of

the '921 Patent or during the reissue proceedings. *See, e.g.*, *Hoffman-La Roche, Inc. v. Promega*

*Corp.*, 319 F. Supp. 2d 1011, 1016 (N.D. Cal. 2004) ("Defendant seeks the court to hold

unenforceable seven patents not at issue in this litigation (the 'absent patents'). . . . Defendant,

however, provides no legal support for this expansive view of the court's power. Accordingly,

the court concludes that the court's equitable powers do not extend to patents that are not at issue

in this litigation.").[4]

## C.  Materiality

### 1.  Omissions

Ni-Q contends that Prolacta failed to disclose product sales that took place more than one

year before the priority date of the '921 Patent, which make the sales "prior art" for purposes of

the patent. The revised priority date of the '921 Patent during the reissue proceedings is

November 29, 2007.

Ni-Q argues that Prolacta failed to disclose sales of its products that constitute prior art

during the reissue proceedings. Prolacta responds that Ni-Q fails to meet its burden of proving

---

[3] Ni-Q also cites *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354 (Fed. Cir. 2014), and *Regeron Pharmaceuticals, Inc. v. Merus N.V.*, 864 F.3d 1343 (Fed. Cir. 2017) (erroneously cited by Ni-Q as 878 F.3d 1041 but quoted from the opinion at 864 F.3d 1343). *Regeron* cites *Apotex* for the proposition that a pattern of a lack of candor may support an inference of intent to deceive. *Regeron*, 864 F.3d at 1351. *Apotex*, however, discussed the pattern of lack of candor within the prosecution of the single patent at issue. *Apotex*, 763 F.3d at 1360, 1362.

[4] Ni-Q attempts to distinguish the cases discussed in this section as involving "invalidity" and not "unenforceability" under inequitable conduct, but these cases involve unenforceability and inequitable conduct.

materiality because Ni-Q fails to identify with specificity "which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F. 3d 1312, 1329 (Fed. Cir. 2009). In its motion, Ni-Q cites the Court's previous opinion holding that claims 1, 2, 4, and 8 of the '921 Patent were invalid under 35 U.S.C. § 102(b) as anticipated by Prolacta's sales of NEO 20. Ni-Q argues that this demonstrates that NEO 20 is material to the '921 Patent. The Court's previous opinion, however, was based on the '921 Patent having a priority date of March 20, 2008, making sales before March 20, 2007 invalidating. The priority date is now November 29, 2007, requiring sales before November 29, 2006. NEO 20 was first sold in March 2007. Thus, it is not anticipatory to the reissue of the '921 Patent and is not prior art based on § 102(b).

Ni-Q also states that Prolact-20, Prolact-24, Prolact-Plus, Neo-Pro, and Prolact22 were all sold by Prolacta before November 29, 2006 and thus are prior art. Ni-Q admits, however, that "all of these products had at least one nutrient component that falls outside the specific ranges claimed in the '921 Patent, and therefore none of them anticipate any of the claims of the '921 Patent." ECF 260 at 16. Thus, sales of these products do not implicate § 102(b). Nonetheless, Ni-Q argues that they are "highly material prior art under 35 U.S.C. § 103" because prior art for purposes of § 102(b) constitutes prior art for purposes of § 103. *See* ECF 260 at 16 (citing and quoting *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1344 (Fed. Cir. 2007)).

This argument is without merit because Ni-Q concedes that Prolacta's sales of these products do not implicate § 102(b) and thus they are not prior art for purposes of § 102(b). After conceding that these products do not anticipate any of the claims of the '921 Patent, Ni-Q's argument that they are prior art under § 103 because they are prior art under § 102(b) does not follow and is without merit. *Cf. Am. Innotek, Inc. v. United States*, 128 Fed. Cl. 135, 154 (2016),

*aff'd*, 706 F. App'x 686 (Fed. Cir. 2017) ("To assess what references are considered prior art for

conducting an obviousness analysis under Section 103, a court is guided by 35 U.S.C. § 102.

*Riverwood Int'l Corp. v. R.A. Jones & Co. Inc.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003) ("The term

'prior art' as used in section 103 refers at least to the statutory material named in 35 U.S.C.

§ 102.").

 Ni-Q next argues that the early sales of these five products are prior art because

manufacturers could have experimented and tailored the products to reach the desired

macronutrient results. Ni-Q does not offer any evidence or further argument explaining how any

of the products could have met the specifications of the '921 Patent with routine

experimentation. *See E.I. du Pont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed.

Cir. 2018). It is Ni-Q's burden to prove that a particular prior art was "but for" material by a

preponderance of the evidence. *Therasense*, 649 F.3d at 1291. Ni-Q fails to meet its burden.

 Instead, Ni-Q generally argues that these products show that DNA-matching of donor

milk and nutrient-standardization were known in the prior art before November 2006 and that

Prolacta filed false affidavits during reissue regarding those attributes. Ni-Q, however, does not

explain or provide evidence regarding how these general attributes or the purported false

statements about these general attributes correlate to one of the products sold before

November 2006 qualifying under § 103 or § 102(b) with respect to any of the claims of the '921

Patent. Thus, Ni-Q fails to show that general DNA matching or nutrient-standardization makes

any of the allegedly undisclosed products sold before November 2006 material. Nor, as

discussed in Section C.2. below, does Ni-Q show by clear and convincing evidence that the

affidavits were "unmistakably false." *Id.* at 1292.

 Additionally, Prolacta disclosed the alleged early sales and Ni-Q's assertions of

inequitable conduct to the PTO. Prolacta provided the PTO with, among other things, (1) Ni-Q's

Third Amended Complaint containing the chart of product sales and describing Prolacta's alleged ongoing pattern of inequitable conduct in alleging Ni-Q's antitrust claim, (2) Ni-Q's answer alleging the affirmative defense of inequitable conduct, (3) this Court's opinion invalidating the '921 Patent under § 102(b), and (4) product information on Prolact-Plus, Prolact-22, Prolact-20, Prolact-24, and NeoPro, including nutritional information.

The "but-for" materiality standard for inequitable conduct requires courts to "determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." *Therasense*, 649 F.3d at 1291. Here, that question has been answered because after considering all of the information, including Ni-Q's claims of inequitable conduct and the previously-undisclosed information, the PTO granted the reissue of the '921 Patent. *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007) (concluding that there was no inequitable conduct when an omission was cured with disclosure so that the examiner was "fully apprised" and "able to fully consider it and any potential effects it may have on the patentability of the claims before issuing his second Office Action"); *AAMP of Fla., Inc v. Auto. Data Sols., Inc.*, 2015 WL 12843845, at *29 (M.D. Fla. Oct. 8, 2015) ("The Court is not determining obviousness in this setting, it is determining but-for materiality based on what the PTO would have done had it known of the references. What the PTO would have done is known; it issued the [later, related] patent."); *cf. ParkerVision, Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1319 (M.D. Fla. 2013) ("Here, the PTO was aware of the Parssinen reference, as evidenced by the reference's citation on the face of the patent, and still issued the patent. One cannot assume that a PTO examiner is an ignorant rube who is easily misled by attorney argument, hyperbole, or understatement."). Ni-Q fails to show the materiality of the early sales.

### 2.  False Affidavits

Ni-Q also argues that during the reissue of the '921 Patent, Prolacta submitted false affidavits. Ni-Q contends that the affidavits falsely asserted that the '921 Patent contained the non-obvious and new invention of DNA-matching breast milk to donors for safety, standardizing nutrients, and standardizing calorie levels, each of which were part of at least one of the other early products sold by Prolacta.

Prolacta responds that the affidavits were submitted in response to a non-final notice of rejection based on different prior art, and Prolacta was not obligated to again notify the PTO about Prolacta's own early sales, which Prolacta had already submitted to the PTO. *See Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) ("An applicant is not required to tell the PTO twice about the same prior art, on pain of loss of the patent for inequitable conduct."). Prolacta also responds that the affidavits do not opine about select aspects of the '921 Patent, but about the invention as a whole, and as Ni-Q itself concedes, none of Prolacta's five products sold before November 2006 contained all of the claimed elements of the '921 Patent and none of those products anticipated the '921 Patent. Thus, concludes Prolacta, Ni-Q fails to show by clear and convincing evidence that any of the affiants *knowingly* submitted an *unmistakably* false affidavit. The Court agrees. Ni-Q's evidence is not clear and convincing.

## D.  Intent to Deceive

For the same reasons Ni-Q fails to prove that the alleged omissions and misrepresentations are material, Ni-Q also fails to prove Prolacta's intent to deceive. Ni-Q fails to show by clear and convincing evidence that Prolacta's intent to deceive the PTO is the single most reasonable inference able to be drawn from the evidence, meaning that the evidence requires a finding of deceitful intent. *Therasense*, 649 F.3d at 1292.

**E. Bill of Costs**

Prolacta first objects to Ni-Q's Bill of Costs on the ground that Ni-Q is not the prevailing party. For the reasons previously discussed, this argument is rejected. Prolacta also objects that Ni-Q should not recover costs because Ni-Q continued to litigate this case for two years after it succeeded on its motions for summary judgment. Other than the $80 witness fees for Elena Medo and Dr. William Rhine, both of whom were deposed in 2020, and the $353.09 service fee on Ms. Medo, all other requested costs were incurred before the Court's 2019 opinions on Ni-Q's motions for summary judgment. For the $433.09 in costs incurred after the Court's opinions on summary judgment ($80 plus $353.09), the Court declines to reduce the Cost Bill because Ni-Q's claim and defense based on Prolacta's alleged inequitable conduct remained.

Finally, Prolacta objects that the declaration of Brenna Legaard, describing the court reporter transcript fees and the service fee for the complaint and the subpoena on Ms. Medo, is insufficient documentation to support the Bill of Costs. Prolacta argues that the Court should exercise its discretion and reduce the Bill of Costs by the amount claimed for the transcripts and service fees. The Court declines to do so, finding that the Declaration of Ms. Legaard sufficiently describes the requested costs.

**CONCLUSION**

The Court DENIES Ni-Q's Motion for Attorney's Fees, ECF 260. The Court approves Ni-Q's cost bill, ECF 258.

**IT IS SO ORDERED**.

DATED this 1st day of June, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 13 – OPINION AND ORDER